[No. S170528. June 21, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY ALFRED FONTANA, Defendant and Appellant.

**COUNSEL**

Alan A. Dressler for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon, Laurence K. Sullivan and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

K&L Gates, Jeffrey L. Bornstein, Holly Hogan, Alice Y. Ahn and Megan F. Cesare-Eastman for Bay Area Women Against Rape, San Francisco Women Against Rape, Community Violence Solutions, Cooperative Restraining Order Clinic and National Crime Victim Law Institute as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Under California's rape shield law, specific instances of a complaining witness's sexual conduct are not admissible to prove consent by the complaining witness in a prosecution for specified sex offenses. (Evid. Code, § 1103, subd. (c)(1).) Such evidence may be admissible, though, when offered to attack the credibility of the complaining witness, provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in Evidence Code section 782. First, the defendant must file a written motion and an offer of proof detailing the relevancy of the evidence. (*Id.*, § 782, subd. (a)(1), (2).) If the court finds the offer sufficient, it shall order a hearing out of the presence of the jury to allow questioning of the complaining witness regarding the offer of proof. (*Id.*, § 782, subd. (a)(3).) If the court finds the evidence relevant under section 780 and admissible under section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted. (*Id.*, § 782, subd. (a)(4).)

In this case, defendant Danny Alfred Fontana filed a written motion with an offer of proof seeking to introduce evidence of the complaining witness's sexual conduct on the morning of March 5, 2003, the day on which the acts charged against him occurred, but the trial court denied the motion without a hearing. We find (1) that the trial court erred in failing to conduct a hearing concerning the relevancy of the complaining witness's sexual conduct earlier that day as an alternative explanation for her oral and vaginal injuries; (2) that defendant could not have been prejudiced by the error with respect to the forcible digital penetration count, inasmuch as the trial court eventually held a hearing in connection with defendant's motion for new trial which established that the complaining witness's earlier sexual conduct could not have caused her vaginal injuries; (3) that defendant was not prejudiced by the error with respect to the oral copulation count, inasmuch as the omission of an alternate explanation (assuming one existed) for her oral injuries was harmless beyond a reasonable doubt; and (4) that the trial court did not abuse its discretion in excluding evidence of the complaining witness's sexual conduct earlier that day, to the extent it was offered to corroborate defendant's

testimony. We therefore reverse the judgment of the Court of Appeal, which had reversed the judgment of conviction without considering defendant's other appellate contentions, and remand the matter for further proceedings.

## BACKGROUND

The crimes of which defendant stands convicted occurred in his room at the Winsor Hotel, a single-room-occupancy hotel in San Francisco, on March 5, 2003. Irene S., who was then 19 years old and had immigrated from the Philippines two years earlier, testified that defendant pulled her into his room, strangled her until she lost consciousness, threatened to kill her, and forcibly penetrated her digitally and forced her to orally copulate him. Defendant, a registered sex offender, admitted that he had attempted to strangle Irene but denied any sexual contact or attempted sexual contact with her.

At the time of the charged crimes, Irene lived with her father in an apartment on Sixth Street and was studying to be a medical assistant. On her way to school, she regularly passed by a discount store and over time became friendly with Aslem Shaikh, the store manager. Shaikh, who had three small children at home, asked Irene whether she would be interested in opening and closing the store on those occasions when he could not be there. She agreed to do so. Because she was so small, defendant, who lived upstairs from the discount store at the Winsor Hotel, assisted her in closing the heavy metal gate and sometimes in opening it. Defendant behaved nicely to her and told her she was pretty.

Around 4:00 p.m. on March 5, 2003, Irene went to the discount store to look for a cheap laptop computer for school. Defendant, who was talking with Shaikh, claimed that he had a laptop in his room to sell but did not want to bring it downstairs. He left the store and invited Irene to come upstairs to the hotel to see it. Irene asked Shaikh to accompany her upstairs, but he could not leave the store unattended. About 10 minutes after defendant left, Irene telephoned him to inquire about the laptop, but defendant reiterated, "[Y]ou have to get it in here."

Irene walked upstairs to the hotel and told the hotel manager's son, Amit Patel, that she was "just gonna be in the hallway . . . . I just want to let you know." She left her keys at the desk as security, in accordance with the hotel's policy. She did not want to go into defendant's room and had arranged to meet defendant at the front counter of the hotel. Defendant met her in the hallway, pointed to his room, and said, "I'm just gonna grab it." As Irene

stood waiting, defendant suddenly pulled her by the neck into his room and pushed her onto the bed. Irene tried to shout, but her voice could not make a sound. Defendant picked up a dumbbell and warned her, "I will kill you if you scream more." His hands continued to constrict her throat, making it difficult for her to breathe, and she passed out.

When she woke up, she was completely naked and defendant was on top of her. She had urinated on herself and was scared. Defendant digitally penetrated her. She begged him not to do this, but he kept choking her and telling her he would kill her if she did not cooperate. As he continued to choke her, she lost consciousness a second time. She testified, "I thought I was dead already," but she awoke to the sound of his voice. He was kissing her all over her body. He told her to "blow" him, but she had to ask him "what it is." Once he explained what he wanted, she said "no," but he forced her to do it anyway. "So I took a chance that if I did it, I will still live. That's why I'm still here."

Irene pleaded with defendant to let her go. Defendant replied, "I don't know if you're going to go to the police or not. But you have to do some nude picture for me so you won't go to the police." Irene complied because she was afraid for her life. He took four or five pictures, and penetrated her digitally one more time. Defendant told her he wanted her to be his girlfriend. He said he would walk her to school every day. He told her he knew she would not go to the police, because he would post the pictures on the Internet if she did. As Irene got dressed, she promised herself that if she ever got out of the room, "he will pay for this. So he wouldn't do that to somebody else."

As defendant walked her outside the room, he repeated that he wanted her to be his girlfriend. Irene went to the hotel manager's son and asked for some water, in a very quiet voice. She whispered to him that she had been raped and asked him to call the police. Defendant, who was about five feet away, said, "Let's go," and walked down the stairs with her.

When they were outside, Irene spotted Shaikh and ran to him, locking the store door behind her. She told him defendant had raped her. Shaikh told her to call the police, but Irene wanted to talk to her father first, because she did not know how soon the police would arrive or where defendant was. Her father was not at his office when she telephoned, however, so Shaikh walked her part of the way home, which was less than 100 yards from the store. She ran the rest of the way to her apartment and told her father what had

happened. He noticed that her eyes were red and that there were marks on her face, and called the police.

Irene described these events to the police at her apartment, to the nurses at the rape treatment center, and to a police inspector who interviewed her at the hospital. Nurse Practitioner Gretchen Johnson-Gelb testified that Irene had petechiae (broken capillaries) all over her face and scalp, a throat that was sore inside and out, a hoarse voice, and difficulty swallowing. Irene also had an abrasion and a bruise on her neck as well as additional petechiae and swelling there. There was hemorrhaging in the sclera of both eyes. A laryngologist found petechiae inside both ears all the way to her eardrums, an engorgement of blood in her throat, and congestion of blood in her nose. Johnson-Gelb testified that these injuries were consistent with strangulation, which can also cause involuntary urination, and that the petechiae injuries were the worst she had ever seen in a live person.

Johnson-Gelb observed injuries that were consistent with forcible oral copulation: an injury to Irene's frenulum, which connects the tongue to the bottom of the mouth, and two lacerations on the interior of her lower lip. There were also injuries that were consistent with forcible digital penetration—a possible laceration on her cervix, which was consistent with a fingernail injury, and erythema on the cervix and right labia minora—but Johnson-Gelb was unable to study these injuries for any length of time because Irene could not tolerate the use of a speculum.

Dr. Amy Hart, a forensic pathologist, confirmed that Irene's injuries were consistent with strangulation, which could cause a loss of consciousness and bladder control. Dr. Hart also stated that the condition of Irene's cervix was consistent with forcible digital penetration and that her mouth injuries were consistent with forcible oral copulation. In Dr. Hart's opinion, the injuries appeared to have been created within the same three-to-five-hour window.

Amit Patel confirmed that Irene had come to the Winsor Hotel that afternoon and that she had left her keys at the desk as collateral. At the time she entered the hotel, defendant said that "she'll only be in about five or ten minutes." Patel testified that Irene actually returned between 30 and 60 minutes later and had sunglasses on. When she asked for a glass of water, Patel could see that her eyes were watery and her face was red. She then told him, in a low and scared voice, that she had just been raped. Patel was shocked and did not say anything, other than to reply that he did not have a water glass. Defendant told her, "I'll buy you some water from downstairs. Let's go." Defendant seemed to act in a demanding manner; he took her by the arm and led her downstairs.

About five or 10 minutes later, defendant came back to the hotel but exited again a short time later. Patel then got a call from Shaikh to come down to the discount store, where Irene was crying uncontrollably. She said defendant had raped and choked her and that he had also taken photographs of her. Patel testified that he had not heard any sounds of a struggle at the hotel.

Aslem Shaikh testified that Irene had appeared "nice" and "perfect" when she left the store to go upstairs to defendant's room but was scared and "totally messed up" when she returned. Her eyes were red, and she was bruised. The next morning, when Shaikh received a call from defendant, Shaikh asked why he had raped her. Defendant said nothing and hung up. Shaikh told police that Irene had said defendant "fucked her without a condom," threatened to hurt her with a rock, and put drugs in her mouth.

A swab from Irene's neck tested positive for the presence of saliva and indicated the presence of DNA that was consistent with two individuals: Irene and defendant. Vaginal swabs were also taken, but there was no match with defendant's DNA profile. Urine was detected in a stain on the comforter in defendant's room.

A pair of eight-pound dumbbells as well as an empty camera case were found in defendant's room when it was searched by police on March 6. No computer or laptop was found. Five nude photographs of Irene were found at the home of defendant's girlfriend.

Defendant was arrested on a bus at the Greyhound station in Santa Cruz on March 7, 2003. He had a one-way ticket in the name of "Dan Heart" from Santa Cruz to Reno, Nevada, with an intermediate stop in San Francisco.

Defendant had been convicted of rape in 1975, as well as false imprisonment, assault with intent to commit rape, and attempting to dissuade a witness in 1992. The prosecution offered the testimony of Nina T., who had been the victim of the 1992 crimes. Nina testified that defendant, an employee in a mechanic's shop where her car was being repaired, volunteered to give her a ride to and from work. One day, on the pretext that her car was ready, he told her to come to the shop and invited her up to the loft. He quickly moved on top of her and placed a knife at her throat. He ordered her to undress and tried to penetrate her with his partially erect penis. He asked her whether she had ever given "head." She said she had not. He said, "Well, there's a first time for everything, isn't there?" but did not follow through. He also asked whether she would prefer it "in your butt"; she said no. At that point, defendant started crying. He said he liked her and did not want to hurt her.

Defendant, who admitted he had a propensity to commit sex offenses and had been classified as a high-risk sex offender, testified at trial. He said that

he had been interested in opening a used-goods store after his release from prison in 2002 and had talked with Shaikh about taking over the site of the discount store. He met Irene shortly thereafter and thought she was good at sales work and would be helpful in the store he was planning to open. He told Irene that he had been convicted of rape and attempted rape and had been to prison.

Defendant had been searching for a cheap laptop because Irene expressed interest in buying one. Defendant testified that a "guy named Rosie" was selling a laptop that appeared new for only $350, so defendant made an arrangement whereby he left his wallet and other property as collateral with Rosie in exchange for the laptop, as well as a military flag that had caught his eye. Defendant was to return by 6:00 p.m. on March 5, 2003, with either the merchandise or $400.

That afternoon, defendant was at the discount store talking with Shaikh about taking over the discount store. When Irene stopped in, defendant told her that he had found a laptop for her, but he did not want to bring it down to the store, inasmuch as he was on parole and "I didn't want to bring something that might have been hot where other people would see me with it." Defendant told Irene to come up to his room to see it, but he had the impression she was not interested at the time he left the store.

Irene telephoned defendant around 4:15 p.m. and asked him to bring the laptop downstairs. He refused to do so, even though being alone in a room or residence with a woman would also be a violation of his parole. When Irene called again and said she was still interested in the laptop, he told her it would cost $400 in cash. He met her at the entrance gate and they walked towards his room. She said his room "stunk" but went inside anyway. He took the laptop out of his backpack and placed it on the bed. She turned it on and announced that she did not have any money; she hoped she could have the computer as an advance on "her pay or commission when we opened the store." Defendant said he did not have money to buy the computer, either, and told her he was disappointed that she had said she had the money and then showed up without it or the $20 she already owed him for a hands-free headset he had obtained for her cell phone.

In response, Irene started to take off her clothes. Defendant said he panicked and did not know what to do. When she was fully undressed and had slid back towards the head of the bed and spread her legs, though, he took off his shirt and sat on the side of the bed next to her. He claimed he saw semen "between her legs in her privates" at that point and was "disgusted," so he got some toilet paper and told her, "You need to wipe yourself off." He took the toilet paper into the hall bathroom and flushed it down the toilet, claiming

that he put his shirt on before he left and removed it when he came back. He did not know why he did so.

Irene, who had put her panties back on at this point, came to the edge of the bed, started undoing defendant's belt, and asked whether she could have the computer now. Defendant believed it was obvious she was offering him sex, so he backed away and took his camera out of a drawer to take pictures of her. Defendant claimed he did this to prevent any false accusations and to prove that he did not do anything to her. While he was taking pictures, Irene unfastened his trousers, pulled out his penis, and moved her mouth close to it. Because defendant has had a lifelong fear of his penis being bitten off, though, he dropped the camera and grabbed her by the neck around her throat.

After he let go, Irene complained, "You made me pee myself," got dressed, and vowed that "she was going to get me, she was going to make me pay." He pulled up his pants, put on a shirt, and followed her out of the room. He told her he would get her some water at the store downstairs and walked outside with her. He urged her not to tell any lies about him: "If you're going to tell somebody I grabbed you by the neck, do that, but don't lie." He denied having intercourse (or attempting to) and also denied digitally penetrating her. Irene went to the discount store while defendant went to a liquor store to buy cigarettes and water, but Irene shook her head when he walked back to the discount store and offered her the bottled water. Defendant returned to his room, panicked, and looked for his camera, which he believed was proof he had done nothing wrong. He put the camera and laptop in his backpack, returned the computer and flag to Rosie, and headed out to the beach, where he spent the night. He called Shaikh the next morning and denied raping Irene.

Defendant went downtown to the Caltrain station and bought a ticket to San Jose. He got off in Sunnyvale, though, walked along Highway 17, and ended up in Santa Cruz, where he gathered his thoughts and decided to try to get back to San Francisco. To do that, he needed money, so he stopped at a church and offered to perform some labor to earn the money for a return bus ticket. The priest gave him a ride to the bus station, where defendant bought a ticket to San Francisco. Later, however, defendant "started getting panicky again" and exchanged it for a ticket to Reno. Defendant used his mother's maiden name on the ticket. He received a phone call from a member of the San Francisco Police Department telling him to turn himself in, but defendant hung up and removed his cell phone battery. In the meantime, he picked up $40 his father had wired to him at his request. Defendant was arrested on the bus before it left Santa Cruz.

Reginald Ford, who was also a resident at the Winsor Hotel, testified that he saw defendant and a young, short, Asian woman talking outside defendant's room on March 5. The door to the room was open. When Ford came back from the bathroom less than a minute later, they were gone. He did not know whether they went inside, and he did not hear any noises coming from the room as he passed by.

Father Philip Vincent Massetti testified that he paid defendant $20 for helping weed a flower bed on March 7 and gave defendant a ride to the bus station in Santa Cruz.

Dr. Marc Snyder, medical director of the emergency department at St. Luke's Hospital, examined a photograph from the speculum examination of Irene. He did not observe a laceration of the cervix and opined that the cervix's condition could be a normal variant or the result of an infection. He agreed that Irene's other injuries indicated she had been strangled.

At the time of these events, Irene was five feet one inch tall and weighed a little over 100 pounds; defendant was six feet tall and weighed 190 pounds.

Following a jury trial, defendant was convicted of forcible digital penetration (Pen. Code, § 289, subd. (a)), forcible oral copulation (*id.*, § 288a, subd. (c)(2)), and assault with intent to commit rape, digital penetration, and oral copulation (*id.*, § 220), all by use of a deadly weapon (*id.*, § 12022.3, subd. (a)). The jury determined that defendant had previously been convicted of a sex offense within the meaning of the "One Strike" law (Pen. Code, § 667.61, subds. (d)(1) & (e)(4)) and, in a bifurcated proceeding, found that defendant had suffered two prior serious felony convictions. (*Id.*, §§ 667, subd. (a), 1170.12.) The court sentenced defendant to a prison term of 75 years to life plus a determinate term of 14 years for forcible oral copulation.

The Court of Appeal reversed, finding that the trial court had erred in excluding evidence of Irene's consensual sexual encounter earlier that day, which could have provided an alternative explanation for injuries to Irene allegedly inflicted during the sexual assault and which could have corroborated defendant's testimony that he saw semen between her legs. The court determined that evidence of Irene's sexual conduct earlier that day was not barred by Evidence Code section 1103, subdivision (c)(1) or by Evidence Code section 352.

We granted the People's petition for review.

### Discussion

Defendant claims error from the exclusion of evidence that the victim, Irene S., had consensual sex earlier in the day of March 5, 2003. The

relevance of this evidence, he asserts, is twofold: (1) evidence of the victim's sexual conduct earlier that day would have provided an alternative explanation for the injuries to her mouth and cervix, and (2) evidence of the victim's sexual conduct earlier that day would have corroborated his testimony that he saw semen "between her legs in her privates" when she spread her legs on his bed. The trial court excluded this evidence in its entirety. The Court of Appeal found that the evidence was admissible on both grounds, that the exclusion of this evidence deprived defendant of due process and of his federal constitutional right to present a defense, and that the error was prejudicial.

■ Evidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions. A defendant may not introduce evidence of specific instances of the complaining witness's sexual conduct, for example, in order to prove consent by the complaining witness. (Evid. Code, § 1103, subd. (c)(1).) Such evidence may be admissible, though, when offered to attack the credibility of the complaining witness and when presented in accordance with the following procedures under section 782: (1) the defendant submits a written motion "stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness" (*id.*, § 782, subd. (a)(1)); (2) the motion is accompanied by an affidavit, filed under seal, that contains the offer of proof (*id.*, subd. (a)(2)); (3) "[i]f the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant" (*id.*, subd. (a)(3)); and (4) if the court, following the hearing, finds that the evidence is relevant under Evidence Code section 780 and is not inadmissible under section 352, then it may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted. (*Id.*, § 782, subd. (a)(4).)

■ The Legislature's purpose in crafting these limitations is manifest and represents a valid determination that victims of sex-related offenses deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy. (*People v. Rioz* (1984) 161 Cal.App.3d 905, 916–917 [207 Cal.Rptr. 903]; accord, *Michigan v. Lucas* (1991) 500 U.S. 145, 149–150 [114 L.Ed.2d 205, 111 S.Ct. 1743].) By affording victims protection in most instances, these provisions also encourage victims of sex-related offenses to participate in legal proceedings against alleged offenders. (Letwin, *"Unchaste Character": Ideology, and the California Rape Evidence Laws* (1980–1981) 54 So.Cal. L.Rev. 35, 40 (Letwin); accord, Advisory Com. Note to Fed. Rules Evid., rule 412, 28 U.S.C.) Accordingly, our courts have properly exercised the discretion afforded by Evidence Code section 782 "narrowly" (*People v.*

*Chandler* (1997) 56 Cal.App.4th 703, 708 [65 Cal.Rptr.2d 687]), and we emphasize that "[g]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness' prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a 'back door' for admitting otherwise inadmissible evidence" (*People v. Rioz, supra*, 161 Cal.App.3d at pp. 918–919).

■ The parties agree that Evidence Code section 1103, subdivision (c)(1) does not bar evidence of the complaining witness's prior sexual conduct when offered to explain injuries the prosecution alleges were the result of the defendant's conduct. The parties further agree that such evidence may be admissible under section 782, provided that the evidence of the complaining witness's prior sexual conduct is relevant under section 780 and is not barred by section 352. We concur. In such circumstances, "it is not the fact of prior sexual activity as such that is important, but something about the special circumstances under which that prior sexual activity took place that renders it important." (Letwin, *supra*, 54 So. Cal. L.Rev. at p. 71.) Where the prosecution has attempted to link the defendant to physical evidence of sexual activity on the complainant's part, "the defendant should unquestionably have the opportunity to offer alternative explanations for that evidence, even though it necessarily depends on evidence of other sexual conduct." (*Id.* at p. 81, fn. omitted.) Indeed, this is the rule not only in the federal courts (Fed. Rules Evid., rule 412(b)(1)(A), 28 U.S.C.), but is generally the rule in those states that have enacted rape shield statutes. (Colo. Rev. Stat. § 18-3-407(1)(b); Conn. Gen. Stat. § 54-86f; D.C. Code § 22-3022(a)(2)(A); Fla. Stat. § 794.022(2); Haw. Rev. Stat. § 412(b)(2)(A); 735 Ill. Comp. Stat. 5/8-2801(b)(1)(A); Ind. Rules Evid., rule 412(a)(2); Iowa Rules Evid., rule 5.412(b)(2)(A); Ky. Rules Evid., rule 412(b)(1)(A); La. Code Evid., art. 412(B)(1); Me. Rules Evid., rule 412(b)(1); Md. Code Ann., Crim. Law § 3-319(b)(4)(ii); Mass. Gen. Laws, ch. 233, § 21B; Mich. Comp. Laws § 750.520j(1)(b); Minn. Rules Evid., rule 412(1)(B); Miss. Rules Evid., rule 412(b)(2)(A); Mo. Rev. Stat. § 491.015(1); Mont. Code Ann. § 45-5-511(2); Neb. Rev. Stat. § 28-321(2)(a); N.J. Stat. Ann. § 2C:14-7(c); N.Y. Crim. Proc. Law § 60.42(4); N.D. Rules Evid., rule 412(b)(1); Ohio Rev. Code Ann. § 2907.02(D); Okla. Stat. tit. 12, § 2412(B)(1); Or. Rev. Stat. § 40.210(2)(b)(B); S.C. Code Ann. § 16-3-659.1(1); Tenn. Rules Evid., rule 412(c)(4)(i), (ii); Tex. Rules Evid., rule 412(b)(2)(A); Utah Rules Evid., rule 412(b)(1); Vt. Stat. Ann. tit. 13, § 3255(a)(3)(B); Va. Code Ann. § 18.2-67.7(A)(1); Wis. Stat. § 972.11(2)(b)(2); see also *Oswald v. State* (Alaska Ct.App. 1986) 715 P.2d 276, 278, overruled on other grounds as noted in *Yearty v. State* (Alaska Ct.App. 1991) 805 P.2d 987, 995, fn. 3; *State ex rel. Pope v. Superior Court* (1976) 113 Ariz. 22 [545 P.2d 946, 953]; *State v. Cunningham* (1976) 97 Idaho 650 [551 P.2d 605, 609]; *Johnson v. State* (1997) 113 Nev. 772 [942 P.2d 167, 171]; *State v. LaClair* (1981) 121 N.H. 743

[433 A.2d 1326, 1329]; *Commonwealth v. Majorana* (1983) 503 Pa. 602 [470 A.2d 80, 84–85]; *State v. Cosden* (1977) 18 Wn.App. 213 [568 P.2d 802, 806]; *Pack v. State* (Wyo. 1977) 571 P.2d 241, 245.)

The Court of Appeal determined that defendant's offer of proof was sufficient to warrant a hearing, that the trial court erred in failing to conduct a hearing to investigate Irene's sexual conduct on March 5, that the trial court abused its discretion in excluding evidence of Irene's sexual conduct, and that the exclusion of this evidence was prejudicial under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. We find that the Court of Appeal was mistaken in part and reverse.

## A. *Proceedings Below*

Prior to jury selection, the district attorney filed a motion to exclude any reference to "Irene's consensual sexual activities with her boyfriend earlier in the day of the incident, and the presence of semen in Irene's vagina." The court agreed that evidence of Irene's sexual conduct was barred by the rape shield law but told the defense, "If you think at some point you've amassed sufficient evidence for me to change my ruling on the rape shield law, just approach and I will take a look at it and be able to evaluate what the actual testimony is at the time and see where we're going to go."

In opening statement, defense counsel announced that defendant was not going to contest Irene's testimony that he strangled her or that he took photographs of her that day.

Nurse Practitioner Johnson-Gelb opined that Irene's injuries, taken as a whole, were consistent with a sexual assault and that the strangulation led her to believe the sexual acts were not consensual. However, she also testified that the arc-shaped laceration on Irene's cervix could have been caused by consensual digital penetration. Dr. Hart, the forensic pathologist, testified that Irene's injuries were consistent with a sexual assault and had the appearance of having been inflicted around the same time or within a three-to-five-hour timeframe, but said on cross-examination that the injuries to Irene's mouth and cervix could also be consistent with voluntary sexual activity.

After these witnesses testified, defendant filed a written motion and declaration under Evidence Code section 782 renewing his request to admit Irene's statements that she had had "sexual contact" with a third party on the day of the alleged attack. The motion noted the expert testimony of Dr. Hart that the victim's injuries were inflicted "within the same day," posited that "the sexual and oral injuries could have happened several hours before the incident with [defendant]," and argued that evidence of Irene's sexual

conduct earlier that day was therefore relevant as to whether "each alleged sexual assault in fact occurred" and whether "an individual other than the defendant was responsible for the sexual injuries to the victim." The motion argued that evidence of Irene's sexual conduct that day "supports a circumstantial inference that a person other than defendant digitally penetrated and copulated her prior to meeting the defendant [*sic*], and that her testimony that the defendant digitally penetrated and orally copulated her is not believable."

At the hearing on this motion, defense counsel reiterated that "[w]e're talking about, first of all, whether acts occurred, we're talking about when acts occurred, and we're talking about the identity or possible identity of a person who inflicted what had been testified to as injuries that were observed in a medical examination and from photographs in this case," since "[e]ither[]or both of those [mouth and cervical injuries] could have happened a period of hours before Miss Irene came in contact with [defendant] that day, and that's totally parallel with her statement at the hospital that she had two sexual encounters the very same day that she has testified that she was abused by [defendant]." Counsel contended that excluding the evidence of Irene's sexual conduct would violate Evidence Code section 782 as well as his federal rights to cross-examine witnesses, due process, and a fair trial.

The trial court denied the motion. It admitted that "the most persuasive" part of the motion was the tendency of this evidence to provide an "innocent explanation" for the injuries to Irene's vagina and cervix, which "might have compelling force in this motion, if that was the only evidence of force." But in this case, the court went on, evidence of these injuries was on its own "not very strong against your client" with respect to the issue of force, nor was it a "substantial part" of the People's case, in light of "all the rest of the evidence regarding . . . the tremendous application of force causing her lack of consciousness." Accordingly, "the need to go into this and establish that yes, indeed, she did have consensual sexual relations, diminishes quite a bit."

### B. *The Asserted Error Relating to the Exclusion of Evidence of Irene's Prior Sexual Conduct as an Alternative Explanation for Her Injuries*

The Attorney General's principal argument against the admission of Irene's prior sexual conduct as an alternative explanation for the injuries to her mouth and cervix is that defendant forfeited the claim by failing to alert the trial court of the precise theory for admission of the evidence. (Evid. Code, § 354, subd. (a).) The record, however, reveals that the substance, purpose, and relevance of the excluded evidence were made known to the court. As set forth above, defendant's motion argued that Irene's nonstrangulation injuries could have been the product of her sexual activity earlier that day. Indeed, the

trial court recognized that the defense sought to offer Irene's sexual activity as "an innocent explanation" for her vaginal injuries and characterized that as "the most persuasive point" in the motion.

The real reason the trial court excluded the evidence was, as the Attorney General acknowledges, because it believed "the defense had no compelling need to provide an innocent explanation for the condition of Irene's genitalia because such an explanation would not negate the more powerful evidence of sexual assault—the strangulation." The Attorney General concedes that this reasoning was "flawed," but assigns the blame for any confusion to defendant himself, who, he argues, "did not assert that appellant would admit to strangling Irene and, therefore, that the defense could distinguish between (1) Irene's injuries caused by an assault that appellant would admit and (2) Irene's injuries caused by a sexual assault that appellant would deny." We disagree. At the time of the motion, defense counsel had already announced in opening statement that the defense would not be contesting the strangulation. We therefore conclude that defendant adequately informed the court of the substance, purpose, and relevance of the evidence of Irene's prior sexual activity.

Defendant argues, and the Court of Appeal found, that the trial court erred in failing to conduct a hearing to investigate Irene's sexual conduct that day. Evidence Code section 782, subdivision (a)(3) provides that a court "shall order a hearing out of the presence of the jury" and "allow the questioning of the complaining witness" concerning the witness's prior sexual conduct "[i]f the court finds that the offer of proof is sufficient." We find that the offer of proof was sufficient. There was expert testimony that the injuries to Irene's cervix and to her mouth could have been caused by consensual sex and that these injuries could have been inflicted three to five hours before the strangulation injuries. The testimony of other witnesses indicated that the strangulation injuries must have been inflicted sometime between 4:30 and 5:30 p.m.—meaning that Irene could have suffered the injuries to her mouth and cervix through consensual sex that occurred as early as 11:30 a.m. Irene had reportedly told a nurse at the rape treatment center that she had had consensual sex earlier that day, and she had apparently explained to the prosecutor that this had occurred with her boyfriend sometime that morning.

Taken together, this evidence offered the possibility that the condition of Irene's cervix and mouth could have been explained by her consensual activity with her boyfriend that morning. If credited, this chain of reasoning could have created a reasonable doubt as to defendant's guilt of the sex-related offenses. The trial court should have conducted a hearing to permit defendant to establish the truth of the hearsay reports of Irene's sexual activity that day and the timing of that activity, and to explore the possible

connection between that activity and the condition of Irene's mouth and cervix as viewed at the hospital that evening.

The failure to conduct the hearing was assuredly harmless as to the cervical injuries, however, inasmuch as the trial court did ultimately conduct a hearing as to those injuries after defendant filed a motion for new trial based on the exclusion of the evidence of Irene's sexual activity earlier that day. Although the court had already determined that the exclusion of this evidence was not error with respect to the digital penetration count, it decided to allow the victim to be examined "to reduce the scope of speculation by this court or others or any other court regarding the issue of prejudice, and to complete the record thereon." This hearing, which was closed to all but counsel and court staff, was limited to exploring the relationship between "the morning consensual sex" and Irene's vaginal injuries. At the hearing, Irene testified that she and her boyfriend had had sex that morning twice between 9:00 a.m. and noon, that he did not insert any foreign object inside her, and that he did not do anything that might have cut or injured her cervix. Because the evidence at the posttrial hearing rebutted the defense theory of relevance, we can conclude that the failure to conduct the hearing during the trial was harmless, in that the record now shows that the trial court did not abuse its discretion at trial in excluding the evidence of Irene's sexual conduct. (*U.S. v. Azure* (8th Cir. 1988) 845 F.2d 1503, 1505–1506.) The Court of Appeal erred in ruling otherwise.

No hearing was ever held to determine whether Irene's earlier sexual activity could have accounted for her oral injuries, however. The Attorney General contends that defendant's offer was insufficient to justify a hearing with respect to the oral injuries because the offer did not itself contain evidence that the earlier sexual activity had encompassed oral copulation. We do not believe that this was fatal to defendant's claim. The offer of proof was not a fishing expedition. Rather, defendant identified a specific basis, consisting of hearsay recorded in hospital records and statements relayed by the prosecutor, for believing that Irene had engaged in sexual activity during the relevant time period. The record does not contain Irene's original statements, but both parties variously referred to Irene's sexual "activities," "experience," "encounters," and "intercourse." These terms are broad enough to encompass oral sex. Even if they were not, there is no indication in the record that Irene's statement at the hospital was intended to be an exhaustive catalog of her sexual activity that day. Accordingly, we agree with the Court of Appeal that the trial court erred in failing to conduct a hearing under Evidence Code

section 782 to investigate whether Irene's prior sexual activity could have provided an alternative explanation for her oral injuries.[1]

However, even if one were to assume that a hearing would have established the existence and relevance of oral sexual conduct by the victim earlier that day, the exclusion of such evidence was harmless under any standard. The jury found beyond a reasonable doubt that defendant digitally penetrated the victim, as the victim had testified and contrary to defendant's testimony that he had no sexual contact with the victim at all. In making this finding, the jury necessarily rejected defendant's claim that he had lashed out violently (but not sexually) at the victim because of his lifelong fear of having his penis bitten off during oral sex. Moreover, defendant's testimony about his lifelong fear of oral sex was thoroughly rebutted by his admissions that he had demanded oral sex from Nina T. in 1992 and that he engaged in oral sex with his current girlfriend. Because defendant has offered no other basis on which the jury could have credited Irene's testimony that defendant forcibly penetrated her digitally but would have disbelieved her testimony that defendant forced her to orally copulate him, any error in excluding evidence of her prior sexual conduct was harmless beyond a reasonable doubt.

C.   *The Asserted Error Relating to the Exclusion of Evidence of Irene's Prior Sexual Conduct as Corroboration for Defendant's Testimony*

Defendant contends that the trial court erred also in excluding evidence that Irene had engaged in intercourse earlier that day, which could have corroborated his testimony that he saw semen "between her legs in her privates" when she was in his room. In excluding this evidence, the trial court remarked that the alleged conduct "was earlier in the day. As such, it's not specifically corroborative of the defendant's claim of visible semen in the afternoon at 4:00. . . . [¶] . . . [¶] Furthermore, it's offered to apparently corroborate the defendant's utterly fantastic and inherently unbelievable and incredible claim that the complaining witness on her own initiative, despite

---

[1] The Attorney General's reliance on *U.S. v. Payne* (9th Cir. 1991) 944 F.2d 1458 as contrary authority is misplaced. The victim in *Payne* had been found in a state of partial undress engaged in heavy petting in a trailer, and the defense sought to admit the incident as an alternate explanation for the condition of the victim's hymen and vagina. (*Id.* at pp. 1468–1469.) In finding that Payne had "failed to establish any likelihood that the activity alleged to have taken place during the trailer incident could provide an alternative explanation of the medical evidence," the court noted (1) that Payne had offered no expert testimony that digital penetration could explain the condition of the victim's hymen and vagina, and (2) that "[n]obody, including Payne, allege[d] that [the victim] engaged in sexual intercourse in the trailer." (*Id.* at p. 1469.) Here, by contrast, defendant did offer expert testimony that consensual oral copulation could explain the victim's oral injuries and did identify a specific, articulable basis for inquiring whether Irene had engaged in such conduct that morning.

refusing to come up before, on her own initiative came up to the defendant's room after recent sex with [her] boyfriend and without drying herself in a condition where she would be uncomfortable, wet and unappealing, where her object was apparently to trade sex for a laptop because she didn't have any money, and in achieving that object, she was to present herself to the defendant. In that condition, she would be presenting herself to the defendant in an obviously unappealing and unattractive condition, which would have the direct effect of defeating the very object of her visit. [¶] On this record, the court does not feel that there has been a sufficient showing that would require the court to exercise its discretion to allow in the testimony regarding her consensual sexual activities that day. [¶] So, this is sort of equivalent to a man essentially walking around with damp jockey shorts with the object of being desirable to a woman with whom he didn't have a close relationship." The Court of Appeal, on the other hand, found that the evidence was relevant to corroborate defendant's testimony that he saw semen "in her privates" and concluded that the trial court had abused its discretion in rejecting defendant's version of events as incredible and unworthy of belief. We find no abuse of discretion by the trial court.

The probative value of the corroborating evidence was slight at best. Even if a fact finder were to fully credit defendant's testimony that he saw semen "in her privates," that fact would not have shed much light one way or the other as to whose version of the events, defendant's or Irene's, was the true one. Under either version of what occurred, Irene was naked, thus affording defendant the opportunity to see "her privates." Yet the presence of semen would have tended to *undermine* defendant's account since, as the trial court stated, if Irene had plotted to entice defendant into giving her the laptop in exchange for sex, one would expect that she would have taken at least the most minimal steps to make herself desirable. Likewise, defendant testified that he took off his shirt and approached Irene even after he had observed her condition—which is presumably the *opposite* of how one would have acted if he had seen semen "in her privates" and had become disgusted.

Moreover, as the trial court also found, defendant's claim that there was visible semen "in her privates" several hours after Irene had intercourse and despite her having worn panties in the interim defies gravity and common sense, and defendant offered no medical foundation that could link his observations to her prior conduct. (*Smith v. State* (Ct.Spec.App. 1987) 71 Md.App. 165 [524 A.2d 117, 128].) The trial court thus rejected the offer not because it found defendant to be a witness who was not credible, but because the link defendant was attempting to draw between Irene's conduct and the visible condition of "her privates" several hours later was unbelievable. (See *Wilson v. State Personnel Bd.* (1976) 58 Cal.App.3d 865, 877–878 [130 Cal.Rptr. 292].) The probative value of evidence that is inherently so

improbable as to be unworthy of belief—or evidence that is very close to that level—is obviously quite low. (*People v. Casas* (1986) 181 Cal.App.3d 889, 897 [226 Cal.Rptr. 285].)

The potential prejudice of this evidence, on the other hand, was substantial. (*U.S. v. One Feather* (8th Cir. 1983) 702 F.2d 736, 739 [the policy of the rape shield law "to guard against unwarranted intrusion into the victim's private life . . . may be taken into account in determining the amount of unfair prejudice"].) For some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity or is proof that the victim got what she deserved—neither of which is a rational or permissible inference. (*U.S. v. Kasto* (8th Cir. 1978) 584 F.2d 268, 271–272.) In addition, the Legislature has determined that victims of sexual assault require greater protections beyond those afforded other witnesses against surprise, harassment, and unnecessary invasion of privacy (see generally *Government of Virgin Islands v. Scuito* (3d Cir. 1980) 623 F.2d 869, 875–876), and defendant's inquiry would have violated those interests, particularly the state interest "to encourage reporting by limiting embarrassing trial inquiry into past sexual conduct." (*Wood v. Alaska* (9th Cir. 1992) 957 F.2d 1544, 1552.)

Finally, defendant had little need to establish that Irene had actually engaged in sex that day in order to support his contention that he was disgusted by the appearance of "her privates," since it can be difficult to distinguish visually between seminal fluid and cervical mucus, which is a normal discharge that increases around the time of ovulation. (Carlson et al., The New Harvard Guide to Women's Health (2004) p. 403.) Defendant's testimony depended on his *belief* that what he saw was seminal fluid, and counsel made precisely that point in argument: "Maybe it wasn't. He didn't have a microscope. It might not have been. It might have been a normal female secretion that gave that appearance . . . . [¶] . . . [¶] He did testify that that's what it was, and that's what he thought it was." Hence, he had little need for proof that what he observed was actually semen.

Under these circumstances, we cannot say that the trial court abused its discretion in excluding the evidence that Irene had engaged in sexual intercourse earlier that day. We likewise reject defendant's claim that this ruling deprived him of his right to confront witnesses or his right to present a defense. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.