Filed 4/27/26  P. v. Miller CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085911 |
| Plaintiff and Respondent, | (Super. Ct. No. BAF2100510) |
| v. | |
| GANNON KELLY MILLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Singerton, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Donald W. Ostertag and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Gannon Kelly Miller on two counts of lewd act upon Jane Doe (Jane), a child under the age of 14 (Pen. Code, § 288, subd. (a);

counts 1 and 2).[1]  The trial court found Miller had a prior strike conviction (Pen. Code, §§ 1170.12, subd. (c)(1) and 667, subd. (c) & (e)(1)) and sentenced him to an aggregate prison term of 16 years.[2]  On appeal, Miller asserts the trial court erred by excluding evidence of Jane's prior "sexual conduct." Finding no abuse of discretion, we affirm.

## BACKGROUND

Jane was 17 and in the 12th grade at the time of Miller's trial.  During the relevant period, she lived with her mother in Banning and often went to her father and stepmother's home in Beaumont (and later Cabazon) to visit her half-siblings, including her younger half-sister Jane Doe 2.

Jane's stepmother met Miller sometime in 2015 or 2016.  She worked at a Dollar Tree store and Miller—who went by "Juan"[3]—would frequently come in as a customer, or sometimes just to "say hello."  Eventually, in 2019, the stepmother brought Miller to the family home to help "run the house," including yard work, cleaning, and "play[ing] with the kids" while she cooked dinner or did the laundry.  She didn't pay Miller for his help but rather offered him work to "get him off the street."

---

[1]    The jury acquitted Miller on two counts of lewd act upon Jane Doe 2, a child under the age of 14 (Pen. Code, § 288, subd. (a); counts 3 and 4), which consequently eliminated the allegation of multiple victims under the One Strike law (Pen. Code, § 667.61, subd. (e)(4)).  We limit our discussion to the conviction offenses in counts 1 and 2.

[2]    The sentence consisted of 12 years in count 1 (the middle term of six years, doubled for the strike prior) and a consecutive four years on count 2 (one-third of the middle term of two years, doubled for the strike prior).

[3]    During his testimony, Miller explained his given name at birth is Gannon Juan Guzman and he sometimes went by Juan.

2

Miller was "often" at the family's home.  And because Jane's stepmother and father came to trust and consider him a friend, they would leave their children alone with Miller.  Jane first met Miller at her father's Beaumont home when she was in sixth grade.  Like the other children, Jane called him "Uncle Juan."

On two occasions, Miller touched Jane inappropriately.  The first time Jane was at her father's house in Beaumont.  She was alone in the living room, lying down on a couch, and watching YouTube on her phone.  Her half-siblings and father were home but in other rooms.  Miller came up behind Jane and lay down on the couch with her.  He placed his body directly against Jane's, and "cuddled" and "held" her "really closely."  With his arms and hands over her clothing, Miller held Jane around her lower stomach.  He was "hugging [her] very tightly."  After about a minute, Miller got up and Jane went to play with the other children.  This was not something Miller would "normally" do with Jane, and it made her feel "[u]ncomfortable."  Although she could not remember her age, she was at least in the sixth grade at middle school when this incident happened.

The second time Miller touched her was at her father's house in Cabazon; the family had moved.  Jane was sitting on the couch watching a movie.  Miller sat down next to Jane.  He then laid down on the couch, placed his head on Jane's lap, with his head facing her body.  As before, Miller made Jane "[u]ncomfortable."  She asked him to get up so she could put a pillow and blanket on her, "kind of like as a barrier."  Miller wouldn't get up at first.  After she "kept telling" him to get up, he finally got up and Jane reached for the pillow and blanket on the couch and put them over her lap to cover herself.  Jane was wearing black skinny jeans with two "big holes" over her thighs.

3

Miller laid back down, placing his head on the pillow that was now on Jane's lap. At some point, Miller removed the pillow and blanket from Jane's lap and laid back down, with his head again on her lap and facing her body. He then put his hand in the hole in her pants over her right leg and "went up" to her upper thigh toward her groin area and touched her "underwear line." His fingers were "brushing" her underwear line, moving "back and forth." As he did this, Miller asked Jane, "Do you have a tattoo here?" This happened when Jane was in the seventh or eighth grade of middle school, when she was possibly 12 or 13.

Jane "panick[ed]" and tried to get up to go the bathroom. She felt "uncomfortable." To get Miller off her, she told him to get up because she was going "to throw up." Miller responded by asking her why she had to "lie to him." Jane got up and locked herself in the bathroom. After five or 10 minutes in the bathroom, Jane came out and intended to go to her sister's room. But she had to "get past" Miller who was in the hallway. Miller grabbed Jane from behind and held her closely around her stomach "for a minute." She was pulling away, telling him to let her go, and hitting his arm so he would release her. When she broke free, Jane went to Jane Doe 2's room and told her what had happened. Jane was crying when Miller came in. He said he was sorry and did not mean to make Jane cry.

When she was in the fifth or sixth grade, Miller told Jane and Jane's younger brother that their "private parts" could be "ticklish." Jane was in the living room playing with her brother, they were tickling each other. Miller came in and the three began talking "about parts that were ticklish." It was then that Miller told the kids, "Your private parts can be ticklish."

After the second incident, Jane told her father and mother that Miller had touched her inappropriately. Although neither Jane's father nor

4

stepmother ever saw Miller touch Jane inappropriately, both observed he was "[v]ery playful" with Jane, "tickling" and "roughhousing" with her. The People admitted evidence of a text message between Jane's stepmother and Miller, in which Miller denied inappropriately touching Jane but said he sometimes "get[s] happy" and "hug[s] and kiss[es Jane and Jane Doe 2] to death."

Miller testified. He estimated he had been at the family's home "30 to 40 times to do work," and the stepmother was "always home" except for three to four times when he was alone with the children. On one occasion, Jane's stepmother asked Miller to do yard work and paint her bedroom walls. When he arrived, the stepmother asked Miller to watch the children and left. While doing yardwork, Miller heard "a commotion" inside. He went into the house and saw Jane and her younger half-brother "tickling each other." Because Jane was tickling her brother "around the area," Miller tried to "educate them" by telling them, "Private parts can be ticklish, but you're not supposed to go near those private parts at all, so be careful where and how you touch and tickle each other." Miller then went back outside to his yard work.

According to Miller, this was the first time he had met Jane. He "interacted" with Jane only "a few times" or maybe "four or five times" over the course of his visits to the family's home. He described Jane as "the quiet one" who "really never came up to [him]" and "hardly" talked to him. Miller denied he inappropriately touched Jane. He gave her "side hugs a few times" but "never did a full-on hug." He played with her and tickled her "a little bit." When asked if Jane ever "indicate[d]" to him "that how [he] touched her might have been a sensitive area," Miller explained once he gave her a "side hug" and "when she leaned in, maybe [his] hand brushed her a little bit."

5

The People also presented the testimony of Dr. Jody Ward, a clinical and forensic psychologist, who testified about child abuse accommodation syndrome, "which is a pattern of behaviors that many children who have been sexually abused within an ongoing relationship."

## DISCUSSION

Miller sought to introduce evidence of three instances of Jane's "prior sexual conduct" he asserted were relevant to impeach her credibility: (1) when she was four years old, Jane's maternal grandfather rubbed his penis on Jane's face; (2) when she was in the seventh grade, Jane was hugged from behind by a classmate causing her to feel uncomfortable; and (3) during the incident that prompted Miller to educate Jane and her half-brother to not tickle each other's private parts, Miller saw Jane touching her half-brother outside his clothing in his genital area. The trial court excluded the evidence under Evidence Code[4] sections 782 and 352, determining it was not relevant and any minimal probative value was substantially outweighed by the potential for undue consumption of time. Miller contends the court prejudicially erred in its rulings.

A defendant generally may not introduce evidence of a sexual assault victim's prior "sexual conduct." (§ 1103, subd. (c)(1); see *People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514 (*Mestas*).) There is a limited exception to this rule if the victim's prior sexual conduct is relevant to her credibility. (§ 1103, subd. (c)(5); *Mestas*, at p. 1513.) Such evidence is admissible in certain sex offense prosecutions "only under very strict conditions" (*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*)), including in lewd act

---

4       Further undesignated statutory references are to the Evidence Code.

prosecutions under Penal Code section 288 (§ 782, subd. (c)(1); accord *People v. Bautista* (2008) 163 Cal.App.4th 762, 781–782 (*Bautista*).)

Section 782 sets forth "a strict procedure" that is "designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility." (*Bautista, supra*, 163 Cal.App.4th at p. 782.) It requires the defendant to file a written motion, "which includes an offer of proof of the relevancy of the evidence of sexual conduct and its relevancy in attacking the credibility of the complaining witness. If the court finds the offer of proof sufficient it shall order a hearing out of the presence of the jury at which the complaining witness may be questioned." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757 (*Daggett*); see § 782, subd. (a)(1–4).) A trial court is not required to hold a hearing " 'unless it first determines that the defendant's sworn offer of proof is sufficient.' " (*Mestas, supra*, 217 Cal.App.4th at p. 1514; see § 782, subd. (a)(2).) For example, where the alleged conduct is not sufficiently like the charged conduct, the trial court may properly determine it is not sufficiently probative of the victim's credibility to require an evidentiary hearing. (*Mestas,* at p. 1517.) "If at the conclusion of the hearing the court finds the evidence relevant and not inadmissible pursuant to . . . section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted." (*Daggett,* at p. 757.)

Because the limitations of section 782 reflect our Legislature's "determination that victims of sex-related offenses deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy," our high court has emphasized " '[g]reat care must be taken to insure that this exception to the general rule barring evidence of a

7

complaining witness' prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a 'back door' for admitting otherwise inadmissible evidence.' " (*Fontana, supra*, 49 Cal.4th at pp. 362–363.)  Thus "our [trial] courts have properly exercised the discretion afforded by . . . section 782 'narrowly.' " (*Id.* at p. 362.)  They are "vested with broad discretion to weigh a defendant's proffered evidence, prior to its submission to the jury, 'and to resolve the conflicting interests of the complaining witness and the defendant.' " (*Mestas, supra*, 217 Cal.App.4th at p. 1515.)

We reverse a trial court's ruling on the admissibility of prior sexual conduct only if the appellant can show an abuse of discretion.  (*Bautista, supra*, 163 Cal.App.4th at pp. 781–782; *People v. Chandler* (1997) 56 Cal.App.4th 703, 710.)  We find no abuse in the trial court's evidentiary rulings here.

Miller filed two motions in compliance with section 782 to admit evidence of the three instances of Jane's prior "sexual conduct."[5]  After permitting counsel to argue both motions, the trial court excluded evidence of the first and third instances without an evidentiary hearing.  It determined the second instance merited an evidentiary hearing, allowed the parties to

---

[5]    We assume, without deciding, the three instances identified by Miller constitute sexual conduct for purposes of sections 782 and 1103.  Section 782 does not define "sexual conduct" except to state that such evidence includes "those portions of a social media account about the complaining witness . . . which depict sexual content, sexual history, nudity or partial nudity, intimate sexual activity, communications about sex, sexual fantasies, and other information that appeals to a prurient interest." (§ 782, subd. (b)(2).)  Courts, however, have construed "sexual conduct" as used in sections 782 and 1103 to "encompass[ ] any behavior that reflects the actor's or speaker's willingness to engage in sexual activity" and cautioned "[t]he term should not be narrowly construed." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 334.)

question Jane about them outside the presence of the jury, and ruled it also was not admissible under sections 782 and 352. Miller does not assign any error to the trial court's procedural rulings under section 782. He challenges only the court's rulings to exclude the proffered evidence, asserting each instance was relevant and admissible to impeach Jane's credibility because, among other things, "they reflected upon her sexual knowledge and sophistication." We disagree.

In *Daggett*, the court explained the potential relevance of a molestation victim's prior sexual knowledge and sophistication. "A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them. [¶] In such a case it is relevant for the defendant to show the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted." (*Daggett, supra*, 225 Cal.App.3d at p. 757.)

Here, the trial court determined the first instance was too dissimilar to the conduct charged in this case and thus was not sufficiently probative of Jane's credibility to require an evidentiary hearing. We find no abuse of discretion here. We agree with the court that the maternal grandfather's act of rubbing his penis on four-year old Jane is, as the People put it, "radically different" from Miller's reported conduct of "simple touching[ ]" over the clothing. Additionally, because Jane was four and her mother was an

9

eyewitness to the maternal grandfather's crime,[6] Jane did not report the molestation. There was no evidence, as the People argued, that Jane even remembered the molestation that happened 10 years before the events in this case. For these reasons, it was not error for the court to reject Miller's theory that Jane learned something from the prior molestation that would inform the jury that her testimony in this case may be false. (E.g., *Mestas, supra*, 217 Cal.App.4th at pp. 1512, 1517 [allegation that seven-year-old victim had shirt and underwear removed by foster care boys when she was three years old too dissimilar to be probative of defendant's act of masturbating in front of victim and forcing her to orally copulate him].)

The second instance involved Jane being "hug[ged] from behind" by a male classmate in the seventh grade, which Miller asserted was "reported as potential inappropriate conduct or sexual assault" to Child Protective Services and ultimately determined "unfounded." He argued the incident was "extremely similar" to Jane's report that Miller hugged her from behind and thus, as in *Daggett*, provided "a potential explanation" of her knowledge to later "experience and/or describe" Miller's conduct. Additionally, Miller argued the incident would provide the jury with "potential insight "that Jane was "potentially unreasonable and/or hyper-sensitive" about people touching her. The People responded that Jane did not report or allege "any sexual misconduct" from this incident, either to social workers or law enforcement. Rather, Jane was describing the incident in a mental health interview (three months after she reported Miller's conduct) and stated the classmate's hug made her feel uncomfortable.

---

6   The maternal grandfather was prosecuted and sentenced to a prison term.

The trial court found "some similarity" and a "potential false accusation of inappropriate sexual behavior" to warrant "at least explor[ing]" it in an evidentiary hearing. In a hearing outside the presence of the jury, Jane testified she was getting "treatment" and told her therapist that a classmate hugged her from behind and it made her feel "uncomfortable." She was not reporting "sexual abuse or anything like that." Though she felt uncomfortable "in a sexual way," she did not feel her classmate touched her in a sexual way "on purpose." At some point Child Protective Services spoke to her and she told the social worker, the classmate "gave me a hug from behind, and that it was a regular hug," and she felt uncomfortable because she was "not very assertive."

After hearing her testimony, the trial court noted that Jane testified she told the truth about the hug, she was not "even sure whether or not it was sexual in nature" (observing that she stated the words, "sexual way," "with a question mark, like she was guessing"), but that she did not feel it was done on purpose. The court found she was describing an act, "not asserting that it was a sexual act." For these reasons, the court concluded the incident was not probative of the charged conduct and its admission would cause an undue consumption of time under section 352.

We, again, find no abuse of discretion here. We disagree with Miller's appellate contention that this hugging incident was relevant to Jane's credibility because it demonstrated "sexual knowledge and sophistication." It was a hug from a seventh grader. Whereas she reported that Miller, an adult, twice got on the couch to lie down with her, and the second time, inserted his hand inside the hole of her pants and touched her underwear line. Not only is there dissimilarity between the two acts, but there is also no unique or special sexual knowledge that would be learned from a hug. And

11

contrary to his assertion that the incident also demonstrated she was "overly sensitive to physical contact" and thus "supported an inference that she mischaracterized or misinterpreted [Miller's] actions," as the trial court found, she did not assert or report the hug as a sexual act or sexual abuse.[7]

As to both the grandfather's molestation and the classmate's hug, Miller contends "the fact that [she] experienced and/or reported prior sexual abuse tended to belie the fundamental theory behind CSAAS, i.e. that victims of child molestation commonly fail to or delay reporting such abuse." But as we have just discussed, Jane did not report her grandfather's molestation nor did she report the classmate's hug to social workers or law enforcement, let alone report it as a sexual act or sexual abuse.

As to the third instance of Jane's prior "sexual conduct," Miller proffered that he would testify he saw Jane "touching" her younger half-brother outside the clothing on his "genital area," he told Jane to stop, and explained to her "that boys' and girls' private parts are ticklish or can be ticklish, but those areas are personal tickle spots and should not be touched by anyone else." Miller argued in his written motion that the testimony was relevant to provide "an alternative explanation" as to why, according to Jane's testimony, Miller would tell her, "Your private parts can be ticklish." The trial court and parties held a long discussion about Miller's request, after which Miller's trial counsel *agreed* with the court's tentative that a section 782 hearing was not necessary and that it would be appropriate to allow

---

7    Miller's trial counsel conceded two days after the section 782 evidentiary hearing that "after putting [Jane] on the stand" regarding the hug, "we were able to ascertain that there was insufficient evidence to support that it was potentially a sexual assault report by" Jane.

12

Miller to provide context for that statement *without* the specifics of Jane allegedly touching her half-brother inappropriately.

The trial court explained it did not find there to be any real inconsistency between Jane's testimony and Miller's proffered testimony and that Miller had a right to explain what he meant by the statement, "Your private parts can be ticklish." But it found the additional context to be insufficiently probative and would involve "so many pitfalls under [section] 352," such as requiring an undue consumption of time because the People may call both Jane and her half-brother to rebut Miller's testimony of any inappropriate touching between the siblings and "a mini trial about whether or not this other incident happened."

After fully explaining its tentative, the trial court asked defense counsel if he had "[a]nything to add." Defense counsel responded, "No, Your Honor. *I agree with the Court.* I guess the defense's primary concern was being able to have the opportunity to explain the statements not in a vacuum. *I think it can be sanitized in a way that we don't have to address directly the specific act that prompted the statement*, but simply the conduct that preceded it. Again, [Jane] testified to the fact that she was tickling [her half-brother], and then . . . Miller can certainly address he had concerns and expressed them to [Jane], not that he specifically saw something that caused that, but just the statement came in after that. *I think that gives the defense primarily what we would want*." (Italics added.)

Consistent with this discussion, the trial court ruled Miller could testify to the statement and the context in which he made it, but not to any alleged inappropriate touching between the siblings on the basis of section 352. Miller then testified that because Jane was tickling her brother "around the area," Miller redirected them by telling them, "Private parts can be ticklish,

13

but you're not supposed to go near those private parts at all, so be careful where and how you touch and tickle each other."

Because Miller acquiesced in the trial court's ruling here, he has forfeited any claim of error on appeal. (*Chyten v. Lawrence & Howell Investments* (1993) 23 Cal.App.4th 607, 617–618 [acquiescence in court ruling forfeits issue on appeal]; *Allin v. International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators* (1952) 113 Cal.App.2d 135, 138 ["One who by his conduct accepts a ruling of the court under circumstances amounting to acquiescence therein, may not complain of it on appeal."].) Even if not forfeited, Miller fails to demonstrate any abuse of discretion in the court's ruling. He devotes a mere three sentences to the argument that exclusion of the " 'tickling' incident" deprived him of "placing into context or fully justifying his statement to [Jane]" and "prevented him from defending his determination that it was not 'appropriate' to tell the parents about the incident." To the extent he means exclusion of Jane's alleged touching of her half-brother in the genital area, he does not explain why this additional fact sheds any further light on his testimony he was educating the children that "[p]rivate parts can be ticklish" so "you're not supposed to go near those private parts at all." The jury, if it credited Miller's testimony, had sufficient context to conclude there was an innocent explanation for his statement to Jane about "private parts."

Fatal to Miller's contentions on appeal, as to all three instances, is his complete failure to address the trial court's section 352 analysis in his opening brief on appeal. His belated three-sentence argument in reply that the proffered evidence would have required minimal additional consumption of time or not confused the jury is inadequate to demonstrate the court abused its discretion under section 352. Under section 352, the trial court

14

enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. (*People v. Woodward* (2004) 116 Cal.App.4th 821, 832.) " 'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Id.* at p. 833.) The court and parties discussed the prosecution's need to call Jane and her half-brother in rebuttal should Miller be allowed to testify about the alleged inappropriate touching between the siblings, and potentially a Child Protective Services employee to explain why the agency closed out the hugging incident as unfounded. It was not arbitrary, capricious, or patently absurd for the court to determine that the minimal probative value of the evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time.

## DISPOSITION

The judgment is affirmed.

DO, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.

15