Filed 6/28/22; Certified for Partial Pub. 7/14/22 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075532 |
| v. | (Super.Ct.No. RIF1503800) |
| KEJUAN DARCELL CLARK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bambi J. Moyer, Judge. Affirmed with directions.

Patrick Morgan Ford for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

On the twelfth day of a jury trial, the jury found defendant and appellant Kejuan Darcell Clark, guilty of (1) rape (Pen. Code, § 261, subd. (a)(2)[1]; (2) forced oral copulation (§ 287, subd. (c)(2)(A))[2]; (3) false imprisonment (§ 236)[3]; (4) first degree burglary (§§ 459, 460, subd. (a)); and (5) robbery in concert inside an inhabited dwelling (§§ 211, 213, subd. (a)(1)(A)). The jury found true the allegations that (A) the rape and forced oral copulation were committed during the burglary (§ 667.61, subd. (e)(2)); (B) during the burglary, a person other than an accomplice was present in the residence (§ 667.5, subd. (c)(21)); and (C) the false imprisonment, burglary, and robbery were committed in association with a criminal street gang with the specific intent to assist criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). Defendant admitted (i) suffering a prior strike conviction (§§ 667, subd. (c)&(e)(1), 1170.12, subd. (c)(1); and (ii) committing the charged "felony offenses while released

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] The record reflects defendant was convicted under section 287, subdivision (c)(2)(A). The prosecutor alleged that the forced oral copulation occurred on July 25, 2015. In 2015, the relevant law for forced oral copulation was section 288a, subdivision (c)(2)(A). In the trial court, defendant argued that he was wrongly charged under section 287, subdivision (c)(2)(A), because that statute did not exist in 2015. The prosecutor conceded that the proper statute was section 288a. The trial court also determined that section 288a was the relevant law in 2015 but concluded that citing section 287 was an error that was "de minimis in nature." Thus, the record reflects a conviction under section 287, subdivision (c)(2)(A), despite the offense having been committed in 2015. We will direct the trial court to correct the indeterminate abstract of judgment.

[3] After finding defendant not guilty of kidnapping (§ 207, subd. (a)), the jury found defendant guilty of false imprisonment, as a lesser included offense.

from custody prior to the judgment becoming final on the primary offense"[4] (§

12022.1). The trial court sentenced defendant to prison for a determinate term of 20

years plus an indeterminate term of 90 years to life.[5] Defendant contends (1) the trial

court erred by excluding evidence of the victim's sexual history; and (2) Assembly Bill

No. 333 changed the requirements for gang enhancements (§ 186.22, subd. (b)), and the

---

[4] " 'Primary offense' means a felony offense for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final, including the disposition of any appeal, or for which release on bail or his or her own recognizance has been revoked." (§ 12022.1, subd. (a)(1).) All the offenses in the instant case were alleged to have occurred on July 25, 2015. The primary offense was derived from defendant's prior strike conviction case (Riverside Superior Court case No. RIF1407110).

Defendant's conviction for his prior strike offense occurred on October 7, 2014, i.e., prior to July 25, 2015. Defendant was granted 36 months of formal probation, with the condition that he serve 178 days in the work release program. On November 25, 2014, defendant was terminated from the work release program with an outstanding balance of 178 days. The following day, the trial court revoked defendant's probation. On March 5, 2015, defendant posted bail. In the instant case, the trial court imposed a consecutive two-year prison term for the on-bail enhancement.

Because the issues are not argued on appeal, we leave for another day the questions of (1) whether bail posted due to a work release probation violation meets the definition of being on bail for "a felony offense" "prior to the judgment becoming final" (§ 12022.1, subd. (a)(1); see also *People v. McClanahan* (1992) 3 Cal.4th 860, 868 [" '[S]ection 12022.1 enhancements . . . are not imposed unless there has been a conviction of both the "primary offense" and the "secondary offense." Thus, section 12022.1 enhancements are never imposed unless the defendant has been convicted of a prior felony as well as a subsequent felony' "]); and (2) whether one trial court case can constitute the basis for both a prior strike conviction and an on-bail enhancement (*People v. McClanahan, supra,* 3 Cal.4th at p. 869 ["[T]he Legislature did not intend on-bail enhancements to operate in the same manner as 'prior felony conviction' enhancements"]).

[5] Defendant asserts the trial court sentenced him to a determinate term of 20 years eight months. The eight months were imposed in the prior strike case, i.e., Riverside Superior Court case No. RIF1407110. Because the eight months were imposed in a different trial court case, we do not include them herein.

evidence in the instant case does not satisfy the new legal requirements, so the gang enhancement must be reversed. We affirm the judgment with directions.

## FACTUAL AND PROCEDURAL HISTORY

There was little dispute regarding the facts that (A) defendant was a gang member; (B) defendant was in the victim's house on July 25, 2015; (C) defendant engaged in intercourse with the victim; (D) the victim orally copulated defendant; (E) defendant's associates in the gang stole the victim's television while defendant and the victim were engaged in intercourse; (F) defendant stopped engaging in intercourse with the victim when her house alarm sounded a warning chirp due to one of defendant's associates opening a door; and (G) defendant and his gang associates sold the victim's television, laptop, and cell phone on July 25, 2015.

The primary disputes in this case pertained to (1) whether the victim knew defendant prior to July 25, 2015; (2) whether the victim had knowledge of the Sex Cash Money street gang prior to July 25, 2015; (3) whether the victim invited defendant to her house; (4) whether the victim consented to intercourse and oral copulation with defendant; and (5) whether defendant stole the victim's laptop and cell phone. We focus our presentation of the facts on the issues that were in dispute.

4

A.      PROSECUTION'S CASE IN CHIEF

1.      *DEFENDANT'S CRIMES*

In December 2013, the victim moved to a house in Moreno Valley with her youngest son (Child)[6]. In July 2015, the victim was 44 years old, and Child was two years old. Child and the victim slept in separate bedrooms. On the night of July 24, 2015, the victim put Child to bed, set the house alarm, and went to sleep. In order to cool the house, the victim left open a downstairs window in the back of the house. When the victim went to sleep, she was wearing a T-shirt and shorts.

At approximately 1:00 a.m. on July 25, 2015, the victim woke because she felt that someone was in her bedroom. Either the victim or defendant turned on the light in the bedroom. The victim had never seen defendant before.

Defendant asked where the victim's jewelry was located as he went through her dresser drawers and closet. The victim heard "noises like bumping around" and realized "someone was downstairs." The victim feared for herself and Child. The victim did not try to escape because she "wasn't going to leave [Child]." Defendant took the victim's cell phone and laptop.

Defendant directed the victim to find a condom. The victim located condoms in the master bathroom and gave them to defendant. The victim prayed aloud, and defendant told her "to shut up." Defendant told the victim, "[Y]ou need to suck this"— directing her to orally copulate him. The victim complied. At the time, the victim was

---

[6] We omit the victim's sons' names to aid in protecting the victim's identity.

5

afraid because she "didn't know who else was in [her] house. [She] didn't know who else was coming up[stairs]."

Defendant put a condom on his penis. The victim was terrified; she could still hear movement downstairs, she was thinking "of getting shot or hurt or other people coming [upstairs]." The victim thought that if she screamed it would "make things worse, and [she] knew [Child] was in the other room." The victim did not resist because she "didn't want to bring more attention to the upstairs," and she "felt like if [she] was quiet and cooperated that maybe [she] would be okay somehow." The victim believed that if she physically resisted, then she would be hurt. Defendant moved the victim's shorts and underwear to the side, and he raped the victim.

The victim's house alarm began sounding a warning chirp because a person downstairs opened the garage door. Defendant left. The victim was unable to call the police because defendant took her cell phone, and she did not have a house phone. The victim went to her house alarm panel and pressed the button for the police. The victim went to neighbors' houses and knocked on their doors. One neighbor came to the door but did not open it. The victim yelled for the neighbor to call the police. The neighbor called 911.

The nurse who conducted the sexual assault examination of the victim, on the morning of July 25, 2015, did not see any injuries on the victim's body. The nurse explained that there may not be injuries after a sexual assault if the person attacked does not physically resist.

6

## 2. *SELECTING THE VICTIM'S HOUSE*

Defendant burglarized the victim's house along with Demario Mosely (Mosely), Eric Parker (Parker), and M.M.[7] Defendant, Parker, and M.M. were members of the Northside Parkland street gang which is a subset of the Sex Cash Money street gang.

During an interview with law enforcement, M.M. explained that he, defendant, Mosely, and Parker (collectively, the Group) were drinking and smoking marijuana together at the Segovia Apartments, in Moreno Valley, waiting for night to fall in order to burglarize a home. The Group planned to find "a house that looks like they have money."

The Group drove to the victim's neighborhood. Because M.M. was the youngest, he knocked on doors, and if a person answered, he would "ask if somebody was there" or "ask to use their phone . . . [because he was] stranded." For example, he would ask, " '[I]s Steve there,' " and then pretend he was at the wrong address. M.M. would then "just go to another house." After knocking on "a few" doors, M.M. knocked on the victim's door and no one answered.

Defendant, Mosely, and M.M. went into the victim's backyard, while Parker waited in the car as the lookout. M.M. removed the screen from the open window. Defendant, Mosely, and M.M. entered the house through the window, and defendant went upstairs to see if the house was empty. Mosely instructed M.M. to help him remove the television from the wall. After Mosely and M.M. placed the television in

---

[7] M.M. was 16 years old at the time of the burglary. Therefore, we are not using his full name.

the car, they went back to the house to get defendant, but defendant was already leaving with the victim's laptop and cell phone.

3. *THE VICTIM'S FAMILY*

The victim's former husband (Husband) was a member of the Eight Trey Crips street gang in Los Angeles. In 2000, the victim divorced Husband. After the divorce, the victim moved from Moreno Valley to Los Angeles. In 2000, the second of the victim's three sons (Son), was approximately five years old, i.e., he was born in approximately 1995. Son moved to Los Angeles with the victim. In approximately 2008, when Son was approximately 13 years old, he moved back to Moreno Valley to reside with Husband.

In 2015, Son was still residing with Husband, in Moreno Valley. The victim estimated that from January 2015 to July 2015, she saw Son less than five times because she had a strained relationship with him. The victim denied having heard of the gang Sex Cash Money prior to the burglary. The victim denied knowing if Son and her eldest son were gang members. The victim denied knowing defendant prior to the burglary.

B. DEFENDANT'S CASE

Defendant was born in November 1994. Defendant is a member of the Eight Trey street gang. Husband was defendant's "original big homie from Eight Trey" in Los Angeles. Husband was "like a father figure" to defendant."

Defendant is also a member of Sex Cash Money and the Northside Parkland clique. Son is also a member of the Eight Trey gang in Los Angeles and the Sex Cash

8

Money gang in Moreno Valley. Son and defendant were "dang near best friends" who have known each other since they were 11 or 12 years old.

Defendant used to see the victim at Saint Andrews Park in Los Angeles when defendant played with Son as a child. Son and defendant both attended Moreno Valley High School. The two were together during the school day and after school. In 2010, on three or four occasions, the victim drove defendant and Son from school to Husband's house and dropped them off.

In early 2014, the victim often dropped Son off at the Segovia Apartments, in Moreno Valley, and then spent a few minutes talking with her friend, Coco, who lived at the apartments. Over time, the victim began spending more time with Coco at Coco's apartment. Defendant also spent time at Coco's apartment; he was visiting Coco's nephews. When defendant and the victim were at Coco's apartment, the victim recognized defendant from "back in the day." Defendant and the victim talked while defendant waited for Coco's nephews.

One night, in June 2015, the victim and defendant were both at a sports bar in Moreno Valley. The victim was there with Coco. Defendant was there with his friend, Terry. While at the bar, defendant and the victim kissed.

After that night, when defendant saw the victim alone at the Segovia Apartments, he flirted with her. Defendant would say things like, "[S]top playing, you gonna let me." In other words, "[A]re you going to let me have sex with you?" The victim did not say no, but she expressed concerns about defendant having "baby mama drama" and defendant gossiping if they did engage in intercourse.

9

On July 24, 2015, defendant saw the victim in her car at the Segovia Apartments and approached her. Defendant asked her, "[I]s today the day? Like stop playing, you always teasing me and stuff. Is today that day? And she's all like, well, just come to the house later on. What she was sayin' is we'll talk about it, basically." The victim told defendant to come to her house at midnight.

Around 11:00 p.m., defendant asked Mosely to give him a ride to the victim's house. The plan for the night of July 24, 2015, was for Mosely, M.M., and Parker to take defendant to the victim's house, then go to a bar in Riverside, and then go to defendant's house.

In the car, defendant directed Mosely to the victim's house. Defendant had been to the victim's house approximately three times before to spend time with Son. When the Group arrived, the garage door was open. Defendant told Mosely to honk the horn, which he did, and the victim came out into the garage. The victim greeted defendant and they walked into the house through the garage.

Inside the house, defendant and the victim joked and flirted with one another. The victim wanted to check on Child, so defendant and the victim went upstairs. Defendant waited on the landing while the victim was in Child's room. When the victim exited Child's room, she went to her bedroom and defendant followed. The two sat down on the victim's bed and discussed whether defendant planned to tell anyone if they engaged in intercourse. Defendant said he could keep a secret. The two engaged in consensual sexual activity.

Mosely, who had been waiting in the car, became bored. Mosely decided to "go inside while [defendant was] upstairs and see what [he] can get." Mosely and M.M. climbed through the open window at the back of the victim's house. Mosely carried a television, which had been mounted on a wall, to the car where Parker was waiting, and M.M. carried the victim's phone and laptop out of the house.

After defendant and the victim stopped engaging in intercourse, due to the house alarm chirping, the victim went downstairs, and defendant followed. The victim saw her television was missing. The victim asked if defendant knew who stole her television. Defendant conceded that his friends "took the TV," and the victim said, "[W]ell you set me up then." Defendant denied planning the burglary, but "[f]rom there on [the victim] started cussing [defendant] out," saying things like, "I should never have messed with your young a-s-s" and that she would "get [Husband] on [defendant's] ass." The victim also said that if defendant did not return her television, then she would accuse him of rape.

At that point, defendant said, "I'm gonna go out there, I'll be right back." Defendant went to the car. Defendant was angry. Defendant said, "Y'all trippin'. Maybe we should bring the TV back. And [Mosley said], bro, it's already sold, it's already sold." Mosley was "the big homie," meaning he had more clout in the gang, so he had "some say-so over the little dudes," like defendant. Thus, in regard to the television, there was "nothin[g defendant] could really do" without starting "problems with the big homies against [defendant]." Defendant entered the car, and the Group "just left it at that and kinda drove off."

C.    PROSECUTION'S REBUTTAL CASE

The victim denied knowing anyone named Coco. The victim denied spending time with a person named Coco at the Segovia Apartments. The victim denied ever having seen defendant at the Segovia Apartments. The victim denied that she let defendant into her house. The victim denied that she invited defendant to her house. The victim denied that she agreed to sexual activity with defendant on the night of July 24 or 25, 2015.

D.    SON AND COCO

Son and Coco did not testify at trial. The prosecutor did not include Son or Coco on the prosecution's witness list. Defense counsel did not include Son or Coco on the defense's witness list.

E.    MOTION IN LIMINE

Prior to trial, defense counsel moved to admit evidence of the victim's sexual history. Defense counsel argued that a victim's sexual history cannot be used to prove consent (Evid. Code, § 1103, subd. (c)(1)), but it can be used to impeach credibility (Evid. Code, § 1103, subd. (c)(5)). Further, defense counsel asserted, "Evidentiary rules may impermissibly interfere with a defendant's constitutional rights when they prevent the defendant from presenting his defense." Defense counsel contended the evidence of the victim's sexual history was "crucial to Defendant's claim of innocence."

Defense counsel made an offer of proof in a declaration[8] that was based on information and belief.[9] In the declaration, defense counsel asserted, among other things, that (1) "Parker will testify that [the victim] had a reputation of having sex with guys from the Segovia Apartments," and (2) Layelle Hayes, who is a friend of the victim's eldest son, would "offer reputation evidence that [the victim] likes to 'Mess' with younger guys and she has been known to mess around with other friends of [Son] and [the victim's eldest son]."

At the hearing on the motion, the trial court explained the statutory scheme for attacking a witness's credibility. The court said, "[Evidence Code section] 786 says, and I think this is extremely important, ['E]vidence of traits of his character other than honesty or veracity[,] or their opposites[,] is inadmissible to attack or support the credibility of a witness.[']" The trial court remarked that the evidence described in defense counsel's offer of proof "goes to . . . character with respect to promiscuity as opposed to honesty, and I think that is my primary difficulty with some of what the Defense is proffering."

---

[8] Defense counsel labeled the document as an affidavit, but it was in the form of a declaration. (*Fairbanks, Morse & Co. v. Getchell* (1910) 13 Cal.App.458, 461 [an affidavit is a written statement verified by an oral oath sworn before an official competent to administer oaths]; Code Civ. Proc., § 2003.)

[9] In general, a "declaration . . . made on information and belief . . . [does] not provide competent evidence of the facts stated therein. [Citation.] 'An affidavit based on "information and belief" is hearsay and must be disregarded.' " (*Baustert v. Superior Court* (2005) 129 Cal.App.4th 1269, 1275, fn. 5.)

Defense counsel argued, "But it all goes under the umbrella of attacking her credibility. . . . [S]he was out there, she was having sex, and she did have a reputation for having sex with younger men, particularly gang members." The trial court responded, "It's not directly relevant to truth and veracity. What it is relevant to is whether she sleeps around and whether she sleeps around with other gang members." The court explained, "It goes right back to consent. . . . [The] rape shield law is there for a reason, and it seems that this is the exact reason why [the] rape shield law is in effect. So that we're not bringing up a complaining witness's entire sexual history, which essentially is she had sex with lots of people all the time so she probably consented." Defense counsel replied, "I understand that's what it does, but I'm more using this to impeach her and to attack her credibility on the fact that she said that she doesn't."

The trial court said the evidence would also be inadmissible under Evidence Code section 352 because "[i]t's distracting to the jury. It's talking about side issues that are not really focused on the issues in this particular case . . . ." The trial court excluded Parker's testimony about the victim's reputation for engaging in intercourse with men from the Segovia Apartments and Hayes's testimony about the victim's reputation for "messing" around with younger men and her sons' friends.

During the trial, defense counsel said he wanted to ask a potential witness questions that would "imply a relationship between [the victim] and [defendant]." The trial court responded, "Well, as I said in the original 402s, I do not want the jury speculating as to a relationship between the two by someone who has seen one or seen

14

the other but not seen them together.  That having been said, there are a number of areas that were asked of [the victim] . . . [¶]  . . .  [¶] . . . on cross-examination that she denied. I think those areas can be inquired into by way of impeachment of her veracity with respect to the answers to those statements.  So it goes to truth and veracity regarding those."

## DISCUSSION

### A.    STATE LAW ERROR

Defendant contends the trial court erred by excluding evidence of the victim's alleged sexual history because such evidence was relevant to the victim's credibility. (Evid. Code, § 1103, subd. (c)(5).)[10]

We review a ruling excluding evidence under the abuse of discretion standard of review.  (*People v. Johnson* (2019) 32 Cal.App.5th 26, 46.)  In a rape prosecution, "reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."  (Evid. Code, § 1103, subd. (c)(1).) However, the foregoing law, does not make inadmissible any evidence offered to attack

---

[10]  Defendant asserts, "[T]he evidence was admissible under [Evidence Code] section 1103 (c)(4) because it related to [the victim's] credibility."  Now and at the time of defendant's trial, Evidence Code section 1103, subdivision (c)(4), provides, "If the prosecutor introduces evidence, including testimony of a witness, or the complaining witness as a witness gives testimony, and that evidence or testimony relates to the complaining witness' sexual conduct, the defendant may cross-examine the witness who gives the testimony and offer relevant evidence limited specifically to the rebuttal of the evidence introduced by the prosecutor or given by the complaining witness."  The People inferred, and we also infer, that defendant intended to cite Evidence Code section 1103, subdivision (c)(5), which concerns credibility.

the credibility of the complaining witness." (Evid. Code, § 1103, subd. (c)(5).) "One proper method of impeachment of any witness is to call other witnesses who contradict him." (*People v. Kinkichi Watanebe* (1928) 91 Cal.App. 290, 292.)

Our Supreme Court has "emphasize[d] that '[g]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness' prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a "back door" for admitting otherwise inadmissible evidence.' " (*People v. Fontana* (2010) 49 Cal.4th 351, 363.)

Defendant contends the evidence of the victim's reputation for engaging in intercourse with members of Sex Cash Money was relevant "to show that she was lying by denying that she knew [defendant], and denying that she knew whether her sons were [Sex Cash Money] gang members or that she knew anything about the gang before the incident."

In seeking to attack the victim's credibility, defendant could have called members of Sex Cash Money to testify that they spent time with the victim, that they told the victim about their gang membership, that they told the victim about Sex Cash Money, and that they told the victim about Son's gang membership. The gang members could provide that testimony without testifying that they engaged in intercourse with the victim. That testimony would serve the purpose of contradicting the victim's testimony without violating the rape shield law (Evid. Code, § 1103, subd. (c)(1)).

To the extent defendant was unable to find such gang members to testify, and thus had to rely upon reputation evidence as circumstantial evidence of the victim's

16

knowledge, there was still no need to discuss the victim's alleged sexual history. Defense counsel could have asked witnesses if the victim had a reputation for spending time with gang members. (See Evid. Code, § 1101, subd. (c) ["Nothing in this section affects the admissibility of evidence offered to . . . attack the credibility of a witness"]; but see Evid. Code, § 786 ["Evidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack . . . the credibility of a witness"].) That the victim may or may not have had sexual intercourse during the time she reportedly spent with gang members is irrelevant to the inference that she knew defendant, "knew whether her sons were [Sex Cash Money] gang members, or that she knew anything about the gang before the incident."

Defendant's appellant's reply brief reads, "And the sexual part could have been sanitized so the witnesses would have testified that [the victim] had many contacts or experiences with [Sex Cash Money] members." That is precisely what defense counsel could have done in seeking to attack the victim's credibility without violating the rape shield law (Evid. Code, § 1103, subd. (c)(1)).

At oral argument in this court, defendant asserted that, while the excluded evidence could have been sanitized, it would have been more effective for the defense to provide evidence of the victim's alleged reputation for promiscuity with gang members, and, because it was impeachment evidence, the trial court erred by excluding it. We are not persuaded. The evidence of the victim's alleged reputation for promiscuity was not necessary for impeachment, and thus, it was within the bounds of reason to exclude it.

17

In sum, the trial court did not abuse its discretion by excluding the evidence of the victim's alleged sexual history because the victim's alleged sexual history was irrelevant to her credibility.

## B. FEDERAL CONSTITUTION

Defendant asserts the exclusion of evidence pertaining to the victim's alleged sexual history violated his federal "constitutional rights to present a defense, to cross-examine adverse witnesses, and to a fair trial."

" 'Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right.' [Citation.] 'A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted.' " (*People v. Bautista* (2008) 163 Cal.App.4th 762, 783.)

A "[d]efendant's entitlement to due process of law does not encompass a right to any process of his own choosing, including the right to introduce irrelevant evidence of sexual history." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1249.) As concluded *ante*, the evidence of the victim's alleged sexual history was irrelevant to attacking her credibility. Therefore, defendant did not have a due process right to introduce the evidence. Further, because the evidence was irrelevant, it did not impact defendant's

18

right to present a defense or his right of cross-examination. We conclude defendant's constitutional rights were not violated.

At oral argument in this court, defendant asserted that the issue of the victim's credibility was not a minor issue—it was a critical issue in this case. To be clear, we are not concluding that the issue of the victim's credibility was a minor issue. Rather, we are concluding that the victim's alleged reputation for promiscuity with gang members is a subsidiary point because that evidence was not relevant to contradicting her claim that she did not know of the Sex Cash Money gang.

C.    GANG ENHANCEMENT

Defendant contends that, after his trial, Assembly Bill No. 333 (2021-2022 Reg. Sess.) changed the requirements for gang enhancements (§ 186.22, subd. (b)). In particular, defendant contends the revised law requires that predicate offenses be committed in concert with other gang members.[11] Defendant asserts that the evidence in the instant case does not meet that new requirement.

" ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]" [Citation.] " 'When the language of a statute is clear, we need go no further.' [Citation.] But where a statute's terms are unclear or ambiguous, we

_____

[11] The changes at issue here made to the gang enhancement statute by Assembly Bill No. 333 have been held to apply retroactively. (*People v. Sek* (2022) 74 Cal.App.5th 657, 667; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478.) The People do not dispute that holding.

may 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.)

" '[C]riminal street gang' means an ongoing, organized association or group of three or more persons . . . whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The word "members" is plural, which means more than one member of the gang must have engaged in criminal conduct.

" '[P]attern of criminal gang activity' means the commission of, . . . , or conviction of, two or more of the following offenses, . . . [and] the offenses were committed on separate occasions or by two or more members." (§ 186.22, subd. (e)(1).) Given that multiple members of the gang must be involved in the pattern of criminal gang activity, the plain meaning of the phrase "the offenses were committed on separate occasions or by two or more members" means there are two options for establishing the requisite pattern: (1) prove two different gang members separately committed crimes on two occasions; or (2) prove two different gang members committed a crime together on a single occasion. It would not suffice to prove, for instance, that one gang member committed two crimes on two different occasions. Because it must be demonstrated that "members" (plural) of the gang are collectively involved in criminal activity—one individual gang member on a crime spree would be insufficient to prove a collective pattern of criminal activity.

There are cases that disagree with the foregoing interpretation. In *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088 and 1089 (*Delgado*), the appellate court concluded that the word "collectively" (§ 186.22, subd. (f)) meant "committed by more than one person." Without identifying an ambiguity in the plain language of the statute, the court turned to legislative history and concluded that the Legislature "inten[ded] to significantly limit the scope of the gang enhancement" when modifying the statute, and a significant limitation would only occur if "collectively" were interpreted to mean in concert, because that interpretation would make the gang enhancement more difficult to prove. (*Ibid.*) Thus, the appellate court concluded that, in order to prove a pattern of criminal activity, the predicate offenses had to be committed by gang members acting in concert. (*Ibid.*)

We do not find the *Delgado* analysis to be persuasive because it turned to legislative history after merely defining the word "collectively." (*Delgado*, *supra*, 74 Cal.App.5th at pp. 1088-1089.) It did not, with respect to our colleagues, devote sufficient attention to the plain language of the statute. If "collectively" means the prior crimes must have been committed in concert, then the first alternative in subdivision (e)(1) is rendered surplusage. The two alternatives are proving that "[(1)] the offenses were committed on separate occasions or [(2)] by two or more members." (§ 186.22, subd. (e)(1).) If "collectively" means the predicate crimes had to be committed in concert, then the prosecutor must always prove the predicate crimes were committed "by two or more members." The alternative option that "the offenses were committed on separate occasions" would be surplusage. (§ 186.22, subd. (e)(1).) We avoid

21

interpreting the statute in a manner that would render one of the explicit options surplusage. (*People v. Loeun* (1997) 17 Cal.4th 1, 9.) In sum, we disagree with *Delgado*'s interpretation of the statute.

In *People v. Lopez* (2021) 73 Cal.App.5th 327, 344-345, the court wrote, "At trial, the People introduced evidence that gang member William Vasquez committed two murders in 2005 and gang member Guillermo de Los Angeles committed a carjacking and robbery in 2005. . . . Assembly Bill 333 will require the prosecution to prove collective, not merely individual, engagement in a pattern of criminal gang activity. No evidence was introduced at trial to establish that the crimes committed by Vasquez and de Los Angeles constitute collective criminal activity by the 18th Street gang." We do not find *Lopez* to be persuasive authority because it did not provide a plain language analysis of the statute pertaining to the phrases (A) "members collectively" (§ 186.22, subd. (f)); and (B) "the offenses were committed on separate occasions or by two or more members" (§ 186.22, subd. (e)(1)).

In sum, a pattern of criminal gang activity may be established by (1) two gang members who separately committed crimes on different occasions, or (2) two gang members who committed a crime together on a single occasion. Next, we examine whether, beyond a reasonable doubt, the jury would have found the predicate offense requirements were satisfied. (*Delgado*, *supra*, 74 Cal.App.5th at p. 1090.)

22

In the instant case, one of the predicate offenses was a robbery committed on October 13, 2014, by Damon Ridgeway, a member of Sex Cash Money.[12] Another predicate offense was an attempted residential burglary committed by defendant on April 7, 2014. Thus, there was evidence that two members of Sex Cash Money committed crimes on separate occasions. Given that evidence, we conclude beyond a reasonable doubt that the jury would have found that members of Sex Cash Money "collectively . . . have engaged in[] a pattern of criminal gang activity." (§ 186.22, subd. (f).)

## DISPOSITION

The trial court is directed to amend the indeterminate abstract of judgment to reflect the statute in Count 5 is Penal Code section 288a, subdivision (c)(2)(A), and send the amended abstract of judgment to the appropriate agency/agencies. In all other respects, the judgment is affirmed.

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.

---

[12] Damon Ridgeway was part of a different subset of Sex Cash Money than defendant. Defendant does not assert there is a lack of substantial evidence for the gang enhancement due to Mr. Ridgeway being part of a different subset.

23

Filed 7/14/22

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

**<u>ORDER</u>**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E075532 |
| v. | (Super.Ct.No. RIF1503800) |
| KEJUAN DARCELL CLARK, | |
|     Defendant and Appellant. | |

THE COURT

Requests having been made to this court pursuant to California Rules of Court, rule 8.1120, for publication of a nonpublished opinion filed in the above entitled matter on June 28, 2022, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of "DISCUSSION" sections "A" and "B."

1

IT IS ORDERED that said opinion be certified for partial publication pursuant to California Rules of Court, rule 8.1105(b).

CERTIFIED FOR PARTIAL PUBLICATION

MILLER_____
Acting P. J.

We concur:

CODRINGTON_____
J.

RAPHAEL_____
J.