Filed 10/21/22  P. v. Flores CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS FLORES,<br><br>    Defendant and Appellant. | A162384<br><br>(San Mateo County<br>Super. Ct. No.<br>18SF009754A) |

Defendant Luis Flores, following a jury trial, was found guilty of raping an intoxicated person, attempted rape of an intoxicated person, and sexual penetration by a foreign object. On appeal, defendant contends the trial court abused its discretion by: (1) excluding a DNA report on the ground it was inadmissible under California's rape shield law; (2) denying motions to continue and (3) denying motions for mistrial. We affirm.

**BACKGROUND**

The victim testified that on a night in August 2018, she and two coworkers went out to drinks at a downtown San Francisco bar. The victim, who weighed a little over 100 pounds, had at least two cocktails and a shot of vodka. Afterwards she was "really, really drunk," and she called an Uber to take her to her Foster City home.

After entering the wrong address, the Uber driver dropped the victim off, alone, a couple of miles from the bar and still in San Francisco. Before

1

leaving, the driver and the other passenger attempted to call the victim a second Uber.[1] They had to type in her destination because she "wasn't capable" of doing it herself. They informed her the next Uber would arrive in approximately five minutes and departed. The subsequent Uber was not able to locate her, and the victim attempted to call a third Uber.

Defendant, who was driving a red car, stopped near the victim, and asked where she was going. The victim remembered seeing an "Uber label" in his car. Thinking this was her driver, she got into the car and told him her address.

The victim remembered falling asleep at different points of the ride. When she awoke one time, defendant was touching her "under" her pants and touching her vagina. At another point, closer to her home, defendant "said come over here and sit on me, and I will take you home." The victim, not knowing where she was, felt unsafe getting out of the car and said, "I wanted to go home, and I did not know where we were, and I just feel I was so drunk and I didn't want to be asked to get out of the car again and standing on the street. And I feel if this happened again this night then I probably never would get home. . . ." Defendant then "helped" or "dragged" her over to him, from the passenger's to the driver's side of the front seat, and proceeded to have sex her.

By this time, the victim's then-husband—who had tracked her location using a cell phone application—found the victim and defendant. He opened the car door and saw the victim "sitting on top of [defendant]" and that she "was drunk." He "pulled" her out of the car and slapped her because she was

---

[1] The victim had called for an Uber "pool," a ride with "multiple numbers of passengers" who are picked up or dropped off along a common route.

"very drunk" and he "wanted to wake me up."  He also told defendant not to leave and called the police.  Defendant told the husband "don't hit her, she's drunk" and apologized, saying "she's okay with it or she agree with it or something."

Foster City Police Officer John Choi, Sergeant Pierre Morrison and Corporal Marcus Terry arrived on the scene.  All three found the victim to be "intoxicated," and "unable to care of herself."  Her speech was "slurred," she was unable to "maintain herself upright," "smelled like alcohol," and had "glossy and red" eyes.  The victim told officers defendant "put his finger in her vagina" and raped her.

Officer Vuong Phan was also on the scene, and he along with Corporal Terry and Sergeant Morrison, spoke with defendant and inspected his vehicle.  The victim was menstruating at the time, and the officers noticed blood stains on the steering wheel, driver's seat, and passenger's seat.

Initially, defendant denied having sex with the victim.  He told Officer Phan the victim was "really drunk," and that they "were just making out kissing."  He said the victim "was the one that was trying to have sex with him."  Later, he said he had just come home from work and was parking his car, when she approached his vehicle and asked if he was her Uber driver.  She asked twice, "because she was so drunk."  When she initially approached him, "she was like stumbling," and he told her he was not an Uber driver and could not take her home because she lived "too far, but she looks too intoxicated" and "was really drunk."  Defendant then decided to drive "35-40 minutes" out of his way to take her home because he was "tr[ying] to be a nice guy."

According to defendant, sometime during the ride, the victim "tried to have sex" with him.  She said she "wanted to" and "was horny," and she

3

started kissing and touching him. Defendant claimed she said if he did not have sex with her, she was going to "have sex with somebody." He then admitted to having sex with her.

Defendant was arrested, taken to the police station, read his *Miranda* rights,[2] and interviewed by Sergeant David Orlando. Defendant largely repeated what he had told the other officers. He again stated he "saw that she was drunk." He also admitted to having intercourse with her, and this time said he had sex with her twice and she "said she would give him sex for a ride home." He told Sergeant Orlando the first time he had sex with her was "approximately 11 blocks away" from where he picked her up, while they were still in San Francisco. The second time was in Foster City, where they were "interrupted by the victim's husband." He added that when the husband opened the door and slapped the victim, he intervened saying, " 'Hey sir don't—don't slap her.' But she's kind of—she's just—she's kind of drunk." Sergeant Orlando noticed defendant had "what looked like dry blood around like the bottom of his fingernails and the nailbeds."

Around 2:00 a.m., approximately two hours after the police had arrived on the scene, the victim's blood-alcohol level measured .121 percent and .124 percent, which is "one and half times" above the legal limit of .08 percent. That meant that around the time of the sexual assaults, the victim's blood-alcohol level would have been .20 percent at 11:00 p.m. and .18 percent at midnight.

The district attorney filed a felony information charging defendant with two counts of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)) and one count of sexual penetration by a foreign object of an intoxicated person (*id.*, § 289, subd. (e)). It was further alleged as to counts 1 and 3 that

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

the offenses were committed in more than one jurisdiction (*id*., § 784.7, subd. (a)).

On the day jury selection began, defense counsel inquired about the DNA report from the victim's SAR examination. Although the SAR examination had been disclosed more than a year earlier, the DNA lab report had not been included "with the initial discovery." The prosecutor provided the report.

The lab report, dated November 14, 2018, stated in pertinent part: "A mixture of DNA from at least three individuals was developed from the sperm cell fractions of the DNA from the red/brown stain on the rear crotch/lower buttocks area on the interior surface of the underwear. . . . Assuming the victim is included as a contributor of DNA to her own underwear, a foreign DNA profile was deduced. Assuming one contributor to the deduced profile, Unknown Male 1 is included as a possible contributor to the deduced profile. This profile is a duplicate and will not be entered into CODIS. No conclusions can be drawn in regards to the remaining low-level alleles in this mixture."

The following day, the defendant moved for a continuance based on the late production of the report, which the trial court denied. The court also granted the prosecutor's pending in limine motion to exclude all evidence of other sexual activity of the victim and denied the defense motion to continue. During the course of trial, defendant made two additional motions to continue and two motions for mistrial based on the belated production and exclusion of the lab report, which the court also denied.[3]

---

[3] We discuss the motions in detail in connection with our discussion of the issues on appeal.

The jury convicted defendant of all charges, and the trial court sentenced him to six years in prison.

## DISCUSSION

### *First Motion to Continue*[4]

#### *Additional Background*

The day before the case was sent out for trial, the prosecutor moved in limine under Evidence Code section 1103[5] to preclude the defense from

---

[4] " 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' [Citation.] 'There is no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*People v. Muniga* (2008) 44 Cal.4th 1101, 1118 (*Muniga*).)

[5] Evidence Code section 1103, subdivision (c) states in pertinent part: "Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution under Section 261 . . . of the Penal Code, or under Section . . . 289 of . . . the Penal Code . . . evidence of specific instances of the complaining witness' sexual conduct . . . is not admissible by the defendant in order to prove consent by the complaining witness. [¶] . . . [¶] (4) If the prosecutor introduces evidence, including testimony of a witness, or the complaining witness as a witness gives testimony, and that evidence or testimony relates to the complaining witness' sexual conduct, the defendant may cross-examine the witness who gives the testimony and offer relevant evidence limited specifically to the rebuttal of the evidence introduced by the prosecutor or given by the complaining witness. [¶] (5) This subdivision does not make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in Section 782." (Evid. Code, § 1103, subd. (c)(1), (4) & (5).)

All further statutory references are to the Evidence Code unless otherwise indicated.

questioning the victim about her prior sexual history without first submitting an offer of proof pursuant to section 782.[6]

The day after jury selection commenced, defendant filed a motion for continuance based on delayed receipt of the DNA lab report. Defendant maintained his version of events was that the victim was "sexually aggressive towards him," that she was "having issues with her husband and that she wanted to have sex," and that if defendant "did not have sex with her she was going to find someone else to have sex with." He claimed this went directly to his defense that he had a "reasonable and good faith belief" the victim was capable of consenting. The DNA report, he asserted, was "potentially consistent" with his version of events because the "results revealed a mixture of DNA from at least three individuals." "Should the complaining witness have the DNA of multiple men in, or about, her sexual region," it would "contradict[] that [the victim] was merely a victim to [defendant's] taking advantage of her intoxication. Such a result would go directly to the

---

[6] Section 782 "imposes a procedural limitation upon the admissibility of evidence of sexual conduct of the alleged victim of rape or a related offense offered to attack her credibility." (*People v. Blackburn* (1976) 56 Cal.App.3d 685, 691 (*Blackburn*).) It requires (1) that the defendant submit a written motion "stating that the defense has an offer of proof of the relevance of evidence of the sexual conduct of the complaining witness that is proposed to be presented and of its relevance in attacking the credibility of the complaining witness," (2) that the motion "be accompanied by an affidavit in which the offer of proof shall be stated," (3) that the court shall determine if the "offer of proof is sufficient," and if so, "order a hearing" to "allow the questioning of the complaining witness regarding the offer of proof made by the defendant." (§ 782, subd. (a)(1)–(3).) If the court determines, following the hearing, the evidence is relevant under section 780 and not inadmissible under section 352, then the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions allowed. (§ 782, subd. (a)(4); *People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*).)

7

credibility of her description of the event, as well as being relevant to a reasonable good belief."

The prosecution opposed the motion, pointing out the report was "clear that there are at least three people whose DNA was found during analysis. One is the Confidential Victim herself. The other is Unknown Male 1. Then there is a third donor with a low level profile. The report does not indicate whether the third donor was male or female or whether the DNA was from a sperm cell or simply an epithelial (skin) cell." But even if the victim had engaged in prior sexual encounters, "it would not," argued the prosecutor, " 'support [defendant's] statement that the complaining witness was the sexual aggressor and that she told him if he did not have sex with her, she would find someone else to have sex with.' " Nor was the evidence relevant to the charged crimes, because the "elements of the crimes are [she was] too intoxicated to give consent and did he know that at the time. Even if [the victim was] throwing herself at him and begging him to have sex with her, if those elements are met then the Defendant is guilty of the crimes charged."

After an in-chambers discussion, where the court indicated an intent to deny the motion, the court heard argument from counsel on the record.

Defense counsel argued:

"[The] rape shield laws are intended to prevent the defense from arguing [that the victim] has sex with other men; therefore, ladies and gentlemen, that goes directly to her credibility. You can't trust her. She's loose. . . . That is not my intent. [¶] My intent is . . . to offer evidence such that it goes directly to the various versions on what happened that night. My client's version, which he stated to the police that night, or the complaining witness' version. If as she indicated my client merely took advantage of her. . . . She had to have sex with him, so he would take her home. That's a completely different scenario than the one he described. The one of her actively being the aggressor; the one actively coming on to [him]; the one saying if you don't want to have sex with me, I will find someone else to have sex with. [¶] The lab

8

report I got yesterday indicates there is at least three people's DNA in an area in your underpants. There was at least two people's DNA in several other places. I just got that yesterday. And the argument as I presented to the Court and what I believe to be true is we believe this was a marriage in trouble. We believe this was a young woman who went out, had some drinks, and was, quite frankly, out to have sex. Either get back at her husband, make herself feel better for whatever reason. Okay. And that she had been engaging in this kind of conduct and that is what my client ran into if you will."

"I am in no way going to say she had sex, therefore you can't believe her. . . . What I am merely trying to do is present facts are consistent with my client's version of events to give the jury a way to consider whose version to adopt, what weight to give. And for that reason, I think that it is relevant. For that reason I don't believe it is protected by the rape shield law. [The statute] clearly says that this is in no way intended to prohibit evidence as it relates to credibility. That is exactly what I am trying to do here. Who do you believe, ladies and gentlemen of the jury; whose version of events? [¶] And I just got this report yesterday. I shouldn't be in a position where we have to guess, you know . . . and if the Court grants the continuance here, what will happen, I will do a test. If it comes back in a way I think is beneficial, I will have to file procedures of 782 and the judge in your position can decide whether it can come in or not."

The district attorney responded, "first off I would like to read a short portion from the significant report that counsel is referring to in which it states, 'Assuming the victim is included as a contributor of DNA to her own underwear, a foreign DNA profile was deduced. Assuming one contributor to the deduced profile, Unknown Male 1,' who I think counsel and I both agree is the defendant, 'is included as a possible contributor to the deduced profile. This profile is a duplicate and will not be entered into CODIS. No conclusions can be drawn in regards to the remaining low-level alleles in this mixture.' And that is the conclusion where it states a mixture of DNA from at least three individuals was found."

The prosecutor continued, "that this woman was coming on to him; she was the aggressor . . . [s]he was out to have sex with people" is simply not relevant to the charged crimes. "[G]iven the crimes that are charged it does not matter whether she consented or not. It actually has absolutely no relevance on these charges. If this was a case of a forcible rape, I can concede that it would matter whether or not she actually consented. But that's not what we have here. [¶] What we have here is somebody who is too intoxicated to give consent and whether the defendant knew or reasonably should have known that. The defense is trying to backdoor in the fact that there may be, may be, some other person's DNA, not even a sperm cell because that's not what the report says. It is not that there are two different sperm cells found on her underwear. But there may be two men's DNA that were found in her underwear to show that she is not a credible witness in a way that doesn't make sense in these facts in this case."

While agreeing the "discovery might have been late," the court denied the motion to continue, stating "from what you [defense counsel] have described as the information that you might be able to gain by having to reevaluate it or having your own expert take a look at it, the results of that in the Court's mind at this point would not be relevant to these charges and that it would fall within the rape shield protections. [¶] I think your argument comes down to if it showed there were other men involved with her that it would just—it doesn't really go to credibility. It goes to an argument that she had a propensity to actively engage in sex, and I don't think that in and of itself is protected by the rape shield protections. So it is for that reason that the Court is denying the motion."

10

*Discussion*

Defendant maintains the trial court erred in excluding the DNA lab report on the basis of the rape shield law and, in turn, erred in denying his initial motion for a continuance.

Under the rape shield law, "[e]vidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions. A defendant may not introduce evidence of specific instances of the complaining witness's sexual conduct, for example, in order to prove consent by the complaining witness." (*Fontana, supra,* 49 Cal.4th at p. 362.)

That said, in a prosecution for enumerated sex crimes, a defendant may, in accordance with the procedures set forth in section 782, seek to admit evidence of the complaining witness's prior sexual conduct to attack the witness's credibility. (§§ 782, subds. (a), (c)(1), 1103, subd. (c)(5).) "[S]ection 782 requires a defendant seeking to introduce evidence of the witness's prior sexual conduct to file a written motion accompanied by an affidavit containing an offer of proof concerning the relevance of the proffered evidence to attack the credibility of the victim. [Citations.] The trial court is vested with broad discretion to weigh a defendant's proffered evidence, prior to its submission to the jury, 'and to resolve the conflicting interests of the complaining witness and the defendant.' [Citation.] '[T]he trial court need not even hold a hearing unless it first determines that the defendant's sworn offer of proof is sufficient.' [Citations.] [¶] If the offer of proof is sufficient, the court must conduct a hearing outside the presence of the jury and allow defense counsel to question the complaining witness regarding the offer of proof. [Citations.] 'The defense may offer evidence of the victim's sexual conduct to attack the victim's credibility if the trial judge concludes following

11

the hearing that the prejudicial and other effects enumerated in . . . section 352 are substantially outweighed by the probative value of the impeaching evidence.' " (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514 (*Mestas*).)

Defendant never filed a motion under section 782; instead, he moved for a continuance. However, the trial court apparently considered his motion sufficient to constitute an offer of proof under section 782, and although the formal procedure set forth in section 782 was not followed, the trial court and counsel essentially followed the sequence set forth in the statute. The court appeared to consider defendant's motion (and his subsequent motions) as an offer of proof. The motions were argued outside the presence of the jury. And the court balanced the purpose of, and interests protected by, the rape shield law and the defendant's claim that the DNA lab report went to the victim's credibility. The court did not make an express finding under section 352. However, on appeal, we presume that the trial court made all findings required to support its rulings. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." Italics omitted.]; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 ["Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error."].)

The trial court did not abuse its discretion in concluding defendant had not made a sufficient showing that the DNA lab report was relevant to the victim's "credibility." As the court explained, at bottom, defendant wanted to use the lab report as proof the victim had a prior sexual encounter so he could argue that, given that prior sexual encounter, the jury should disbelieve her

testimony that she was falling-down drunk, and defendant raped her. The court correctly concluded this was improper under the rape shield law and therefore did not abuse its discretion in disallowing use of the DNA lab report. It also, in turn, did not abuse its discretion in denying defendant's motion to continue to further examine the lab report. (See *Muniga, supra*, 44 Cal.4th at p. 1118 [denial of motion to continue is reviewed for abuse of discretion].)

### *Second and Third Motions to Continue and First Motion for Mistrial*[7]
#### *Additional Background*

On direct examination, the victim testified she had not engaged in any "promiscuous behavior" outside of her marriage, it was not her "common practice to engage in sexual intercourse" with her husband while she was menstruating, and she did not want to have sex with defendant.

Following this testimony, defendant made a second motion to continue and also moved for a mistrial. Counsel asserted, "We know that there is a DNA test that has at least three people's DNA in it. That is what the test results were and this is exactly what I was anticipating. And given that the District Attorney opened the door, asked those questions, I am now in a position where I can't properly respond because I got that document after we started trial. And I believe good cause exists. If it didn't exist before good cause now exists. There were two specific questions. The answer would go directly to her credibility given the test results, which is not protected by the rape shield law."

---

[7] "The denial of a mistrial motion is reviewed for abuse of discretion." (*People v. Ng* (2022) 13 Cal.5th 448, 561.) A motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.)

The prosecutor opposed both motions, asserting the "DNA report talks about epithelial cells, not necessarily multiple sperm cells or anything of that nature. It talks about a low level cell deposit that was made, that was found not even inside of the victim." There was no indication that there was "semen from another person found inside her," and since the victim lived with "at least four other people" the epithelial or skin cells could have come from any of them.

The court denied both motions—while the "question about her promiscuousness" brought defense counsel "closer," it was not "enough to overcome the statute."[8]

On redirect, the victim similarly testified she did not have sex "outside of marriage." Defendant made a third motion to continue. The court denied the motion on the same grounds as it had the previous motions.

***Discussion***

"While strictly precluding admission of the victim's past sexual conduct for purposes of proving consent, Evidence Code section 1103, subdivision (c)(4), allows the admission of evidence of prior sexual history relevant to the credibility of the victim. Because the victim's credibility is almost always at issue in sexual assault cases, Evidence Code section 782 specifies a procedure requiring an in camera review of the proffered evidence to diminish the potential abuse of section 1103, subdivision (c)(4). The defense may offer evidence of the victim's sexual conduct to attack the victim's credibility if the trial judge concludes following the hearing that the prejudicial and other

_____

[8] As defendant repeatedly states in his briefing, the court appeared to assume for purposes of argument that defendant was correctly interpreting the lab report, i.e., that it indicated the victim had had sex with several sexual partners.

14

effects enumerated in Evidence Code section 352 are substantially outweighed by the probative value of the impeaching evidence." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 707–708, fn. omitted (*Chandler*).) "By narrowly exercising the discretion conferred upon the trial court in this screening process, California courts have not allowed the credibility exception in the rape shield statutes to result in an undermining of the legislative intent to limit public exposure of the victim's prior sexual history. [Citations.] Thus, the credibility exception has been utilized sparingly, most often in cases where the victim's prior sexual history is one of prostitution." (*Id.* at p. 708.)

Defendant maintains credibility was a "central issue" in the case and the lab report was pivotal evidence in this regard. He asserts the report established "there had to be at least three males that had sexual contact with the [victim]"—contrary to the victim's testimony that she had never had sex "outside of marriage" and never had sex, even with her husband, while she was on her period. Defendant therefore concludes the lab report "tend[ed] to directly corroborate [his] version of events that the [victim] was out looking for casual sex that night," contrary to her testimony she had gone out for drinks and gotten drunk, and then wanted to go home.

To bolster his claim that this "case was, at its core, a credibility contest," he points to several statements by the prosecutor during closing arguments.[9] However, these selected and out-of-context statements do not

---

[9] These are: (1) "And as to the veracity of defendant saying she was horny and she came onto me I will ask you to use your common sense and look at all the evidence in the totality"; (2) "The only way the defense theory makes sense is if you believe that the confidential victim in this case somehow became amorous, became horny, wanted to have sex with the defendant once she was in his car"; (3) "You have to believe that she wanted nothing more from him than just a ride home in her state. You have to

15

show that the victim's credibility was the "central issue" in the case. The prosecutor's closing argument consumes almost 50 pages of the reporter's transcript, and she repeatedly emphasized that the principal issues were whether the victim's condition at the time of time of crimes precluded her from giving consent and whether, given her condition, defendant could reasonably have believed she could give consent.[10]

Defendant also asserts that in order for the jurors to believe the victim was not " 'able to understand and weigh the physical nature of the act, its moral character, and probable consequences,' " they "had to believe [the victim's] entire account." However, "if [the victim] had a sexual encounter earlier in the evening, her entire account of the evening would have been impeached and the jury could have reasonably concluded that she did remember what happened. From that, a reasonable juror could conclude that if she was less than truthful about what she had been doing prior to meeting

---

believe that at the point where he was having sex with her, given everything else you know about her state, and given what he himself had said about how she presented, that she couldn't exercise reasonable judgment"; and (4) "Do you believe him when he says that that is what she wanted? You can't believe him. It is ridiculous, it is ludicrous . . . [¶] . . . [¶] . . . all of a sudden she got in his car and decided to have sex with him not once but twice? You have to judge the credibility of the evidence that has been presented to you."

[10] The People had to prove "defendant knew or reasonably should have known that the effect of the intoxicating substance prevented the woman from resisting." (Pen. Code, §§ 261, subd. (a)(3), 289, subd. (e); CALCRIM No. 1002.) A defendant "is not guilty of [these] crimes if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting." (CALCRIM No. 1002.)

16

with appellant, she could also be less than truthful about whether she was capable of providing consent."

There is no basis for defendant's sweeping assertion that to find the victim was incapable of giving consent, the jury was required to believe her "entire account" of the evening. To the contrary, all the jury had to find was that she was so intoxicated by the time she climbed into defendant's car that she could not have consented to having sex with defendant, and the jury could have so found on the basis of the testimony of all the other witnesses, the blood alcohol tests, and the body cam tapes.

Defendant additionally asserts that "evidence of a prior sexual encounter with another person would be evidence that there were other potential witnesses that the prosecution was not presenting," which defendant could potentially "use to show that there are holes in the prosecution theory of the case." Not only is this sheer speculation, but defendant also fails to explain what "holes" in the "prosecution theory" (namely, that the victim was too drunk to have consented and defendant could not have reasonably believed she could consent) could be illuminated by such a hypothetical witness.

In short, evidence the victim lied about not having a prior sexual encounter was not relevant to what, in fact, *were* the most important issues in the case—whether the victim was so drunk she could not have consented to the sex with defendant, and whether given her condition, defendant could not have reasonably believed she could give consent.

Defendant also contrasts the instant case with *Fontana, supra,* 49 Cal.4th 351. In *Fontana,* the defendant was convicted of forcible digital penetration, forcible oral copulation, assault with intent to commit rape, digital penetration, and oral copulation, all by use of a deadly weapon. (*Id.* at

17

p. 361.) At trial, he admitted he had lashed out violently at the victim but denied any sexual contact with her, claiming a "lifelong fear of having his penis bitten off during oral sex" and his "disgust[]" when he saw what appeared to be semen between the victim's legs. (*Id.* at pp. 355, 359, 368.) The defendant sought to introduce evidence of the victim's sexual encounter with her boyfriend earlier that day, asserting it would corroborate his testimony that he saw semen between the victim's legs. (*Id.* at pp. 354, 362.)

The trial court denied the motion without a hearing, stating the alleged encounter " 'was earlier in the day. As such, it's not specifically corroborative of the defendant's claim of visible semen in the afternoon. . . . Furthermore, it's offered to apparently corroborate the defendant's utterly fantastic and inherently unbelievable and incredible claim" that the victim came on to him in an effort to substitute sex for payment for an item which the defendant rejected out of disgust. (*Fontana, supra,* 49 Cal.4th at pp. 368–369.) The Court of Appeal reversed, concluding the trial court had abused its discretion in "rejecting defendant's version of events as incredible and unworthy of belief." The Supreme Court reversed the appellate court. (*Id.* at p. 369.)

The high court explained, the "probative value of the corroborating evidence was slight at best. Even if a fact finder were to fully credit defendant's testimony that he saw semen 'in her privates,' that fact would not have shed much light one way or the other as to whose version of the events, defendant's or [victims], was the true one. Under either version of what occurred, [the victim] was naked, thus affording defendant the opportunity to see 'her privates.' " (*Fontana, supra,* 49 Cal.4th at p. 369.) The trial court rejected "the offer not because it found defendant to be a witness who was not credible, but because the link defendant was attempting to draw between [the victim's] conduct and the visible condition of 'her privates' several hours

later was unbelievable." (*Ibid*.) The "probative value of evidence that is inherently so improbable as to be unworthy of belief—or evidence that is very close to that level—is obviously quite low." (*Id*. at pp. 369–370.)

Moreover, the potential prejudice of the evidence was substantial. (*Fontana, supra*, 49 Cal.4th at p. 370.) "For some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity or is proof that the victim got what she deserved—neither of which is a rational or permissible inference. [Citation.] In addition, the Legislature has determined that victims of sexual assault require greater protections beyond those afforded other witnesses against surprise, harassment, and unnecessary invasion of privacy [citation], and defendant's inquiry would have violated those interests, particularly the state interest 'to encourage reporting by limiting embarrassing trial inquiry into past sexual conduct.' " (*Id*. at p. 370.)

Defendant asserts that unlike in *Fontana*, "there is nothing inherently unbelievable or incredible in [his] contention that the [victim] was legally able to consent to having sex and that she in fact initiated sex with [him] both times." While that might theoretically be true, the difficulty is that the evidence defendant sought to admit was not probative as to either the victim's capacity to consent to sexual contact or defendant's reasonable belief as to her capacity to consent. Again, even if she was fawning all over him, *that* was not the issue—the issue was whether she was in any condition to consent to sex and whether defendant could reasonably believe that she could consent.

At best, as in *Fontana,* the evidence had minimal probative value on a tangential issue. (See *People v. Casas* (1986) 181 Cal.App.3d 889, 897 [where evidence of other sexual conduct was "only slightly relevant to attack

[victim's] credibility," court did not abuse discretion in excluding it].) In addition, as *Fontana* explains, the evidence had the potential for being highly prejudicial.

Accordingly, the trial court did not abuse its discretion in continuing to exclude the DNA lab report and in denying defendant's motions for a continuance and for mistrial.

Even if the trial court erred in continuing to exclude the lab report, it is not reasonably probable the verdict would have been different had the error not occurred. As we have discussed its relevance was tangential at best. Moreover, every witness who testified—the victim, the officers at the scene, and the first Uber driver—all stated the victim was highly inebriated: The victim stated she was "really, really, drunk." The officers described the victim as "intoxicated," smelling of alcohol, and having "slurred" speech, being unable "to take care of herself" and incapable of "maintain[ing] herself upright." The first Uber driver said she "was slumped over," and in his mind, "I was like this woman is drunk." Defendant, himself, said the victim was "really drunk." All of this was corroborated by the blood-alcohol test results showing the victim had a blood-alcohol level of .124 percent and .121 percent and the parties' stipulation that, based on the victim's weight, her blood-alcohol level would have been .20 percent at the time defendant encountered the victim on the street, and .18 percent at the time the police arrived on the scene. Given this record, we cannot conclude any error in excluding the lab report affected the verdict.[11] (See *Chandler, supra*, 56 Cal.App.4th at p. 711

---

[11] Nor was there any violation of defendant's right to conduct cross-examination or to a fair trial. (See *Mestas, supra*, 217 Cal.App.4th at p. 1517 ["There is no fair trial problem with exclusion of evidence under . . . section 1103."]; *Blackburn, supra*, 56 Cal.App.3d at p. 690 [exclusion of evidence under sections 1103 and 782 does not abridge a defendant's constitutional

[although trial court erred in excluding testimony of victim's prior sexual conduct on the sole ground the testimony was "unbelievable," the error was harmless; considering the "entire record," it was "not reasonably probable the error affected the verdict"]; see also *Manai v. Valenzuela* (9th Cir. 2016) 660 Fed.Appx. 502, 504 [even if California trial court erred in excluding evidence under rape shield law, it was harmless as extensive evidence corroborated the victims' testimony].)

## *The Second Mistrial Motion*

### *Additional Background*

During closing, the prosecutor spoke of several "red herrings" defendant would possibly focus on, including, among other things, the victim's "bad marriage," a domestic violence situation with the victim's husband, and DNA evidence. As to DNA evidence, the prosecutor argued:

> "The DNA. Where is the DNA test? How come we don't have a DNA test? He admitted he had sex with her twice. What is a DNA test going to prove? Remember my job is to prove this case to you beyond a reasonable doubt. Not beyond any doubt or all possible doubt. It is beyond a reasonable doubt. This case isn't about who did it. We know who did it."

The prosecutor then briefly discussed more "red herrings" before moving on with the rest of with the rest of his argument.

Before defense counsel commenced closing argument, she again moved for a mistrial, asserting "I am in a position [where] I can't answer. . . . There is DNA evidence and I can't bring it in. And I think that prejudices the jury,

---

rights]; see also *People v. Eubanks* (2011) 53 Cal.4th 110, 143 [" ' "[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights." ' "]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [no constitutional violation where a trial court does not preclude a defendant from presenting a defense, but only rejects some evidence concerning the defense].)

it misleads the jury on that issue and it creates an unfairness where she's raising issues that I can't respond to."

The prosecutor responded, "Your Honor, it was clear from my closing that I was talking about this portion and the red herrings section of my closing argument where I was saying the defense might bring up the *defendant's* DNA. Why wasn't there results of the SAR examine published to you? In terms of—the identity of *him* is not at issue here, and I still think that is the case as I think it has been made clear on the record the fact that a SAR exam was done well in advance. Neither party has bothered to check to see if that unknown male, one, corresponded with the defendant because the defendant admitted. And so I ask the court to deny the motion for mistrial at this point." (Italics added.)

The court denied "the motion . . . at this time," without further explanation.[12]

### *Discussion*

Defendant contends his chances of defending the charges were "irreparably damaged by his [trial] counsel's inability to discuss the results of the DNA test, especially given [the prosecution's] explicit reference to the lack of any DNA evidence in the case in front of the jury." This statement, he contends, "led the jury to believe that no such evidence existed and placed [counsel] in the impossible position of having to defend [defendant] without the evidence that would have been most crucial in undermining the most important witnesses' credibility, the victim."

To begin with, " '[t]o preserve a claim of prosecutorial misconduct for appeal, " ' "a criminal defendant must make a timely and specific objection

---

[12] Defendant subsequently made a motion for new trial, which the court also denied.

and ask the trial court to admonish the jury to disregard the impropriety." '
[Citation.]  The lack of a timely objection and request for admonition will be
excused only if either would have been futile or if an admonition would not
have cured the harm." [Citation.]' " (*People v. Lima* (2022) 80 Cal.App.5th
468, 478 (*Lima*); *id*. at p. 479 [defendant forfeited claims that trial court erred
in denying motion for mistrial based on alleged prosecutorial misconduct
during argument to the extent he failed to object and request that jury be
admonished].)  Defendant did not object to the prosecutor's argument he is
now claiming warranted a mistrial and has therefore forfeited the issue on
appeal.

But even assuming defendant preserved the issue and further
assuming the prosecutor went beyond the bounds of proper advocacy, any
misconduct was harmless.  The challenged argument was a fraction of the
prosecutor's closing argument.  Indeed, the bulk of the prosecutor's argument
focused on the principal issues—whether the victim's condition at the time of
time of the crimes precluded her from giving consent, and whether, given her
condition, defendant could have reasonably believed she could consent. The
jury was also properly instructed that the attorney's arguments were not
evidence.  "We presume the jury understood and followed the court's
instructions." (*Lima, supra,* 80 Cal.App.5th at p. 481.)  Finally, as we have
discussed, the evidence supporting the verdicts was overwhelming.  (*Id*. at
pp. 480–481 [prosecutor's misconduct during closing argument "was harmless
in light of the overwhelming evidence of guilt adduced at trial"].)

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Devine, J.*


*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A162384, People v. Flores